[No. S105058. June 21, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES FREDDIE CAVITT, Defendant and Appellant.
THE PEOPLE, Plaintiff and Respondent, v.
ROBERT NATHANIEL WILLIAMS, Defendant and Appellant.

**COUNSEL**

Neil Rosenbaum, under appointment by the Supreme Court, for Defendant and Appellant James Freddie Cavitt.

Paul V. Carroll, under appointment by the Supreme Court, for Defendant and Appellant Robert Nathaniel Williams.

Bill Lockyer, Attorney General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Ronald A. Bass and Gerald A. Engler, Assistant Attorneys General, Christina V. Kuo, Catherine A. Rivlin and Jeffrey M. Bryant, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BAXTER, J.**—Defendants James Freddie Cavitt and Robert Nathaniel Williams were convicted in separate trials of the felony murder of 58-year-old Betty McKnight, the stepmother of Cavitt's girlfriend, Mianta McKnight. Defendants admitted plotting with Mianta to enter the McKnight home, to catch Betty unawares and tie her up, and to steal Betty's jewelry and other property. On the evening of December 1, 1995, with Mianta's assistance, the plan went forward. Defendants entered the house, threw a sheet over Betty's head, bound this hooded sheet to her wrists and ankles with rope and duct tape, and escaped with guns, jewelry, and other valuables from the bedroom. Betty was beaten and left hog-tied, facedown on the bed. Her breathing was labored. Before leaving, defendants made it appear that Mianta was a victim by pretending to tie her up as well. By the time Mianta untied herself and called her father to report the burglary-robbery, Betty had died from asphyxiation.

The evidence at trial amply supported a finding that defendants were the direct perpetrators of the murder. However, there was also evidence that tended to support the defense theory—namely, that Mianta deliberately suffocated Betty, for reasons independent of the burglary-robbery, after defendants had escaped and reached a place of temporary safety. Defendants assert that the felony-murder rule would not apply to this scenario and that the trial court's instructions erroneously denied the jury the opportunity to consider their theory.

Because the jury could have convicted defendants without finding they were the direct perpetrators of the murder, we granted review to clarify a nonkiller's liability for a killing "committed in the perpetration" of an inherently dangerous felony under Penal Code section 189's felony-murder rule.[1] (See *People v. Pulido* (1997) 15 Cal.4th 713, 720–723 [63 Cal.Rptr.2d 625, 936 P.2d 1235] (*Pulido*).) We hold that, in such circumstances, the felony-murder rule requires both a *causal* relationship and a *temporal* relationship between the underlying felony and the act resulting in death. The causal relationship is established by proof of a logical nexus, beyond mere coincidence of time and place, between the homicidal act and the underlying felony the nonkiller committed or attempted to commit. The temporal relationship is established by proof the felony and the homicidal act were part of one continuous transaction. Applying these rules to the facts here, we affirm the judgment of the Court of Appeal.

---

[1] The jury also found true the burglary-murder and robbery-murder special circumstances. Defendants have not independently challenged the special circumstance findings in this proceeding, and we express no views here as to the scope of a nonkiller's liability under the felony-murder special-circumstance provisions.

BACKGROUND

Defendant James Cavitt started dating Mianta McKnight in January 1995. Mianta's father, Philip, and her stepmother, Betty, disapproved of the relationship. Concerned about Mianta's late-night dating and her high school truancy, Philip insisted that Mianta move from Oakland, where she had been living with Philip's niece, back to Brisbane to live with him and Betty. He hoped this would keep her away from Cavitt.

After moving back to Brisbane in November 1995, Mianta became upset that Philip and Betty did not allow her to go on dates with Cavitt. Her relationship with Betty in particular had been rocky for some time, and she often told her schoolmates that she hated Betty.

Around the end of November 1995, 17-year-old Mianta, 17-year-old Cavitt, and Cavitt's friend, 16-year-old defendant Robert Williams, developed a plan to burglarize the McKnight house, where Mianta was then living. The plan was to enter the house with Mianta's assistance, tie up Betty, and steal what they could find. The three scheduled the burglary-robbery for December 1. On that afternoon, Mianta purchased rope and packing tape on the way home from school. Later on, she placed a bed sheet outside the house and left the side door unlocked.

Around 6:30 p.m., Williams and Cavitt drove together to the McKnight house. They were wearing black clothes, gloves, and hockey masks and were carrying duct tape. Between 7:00 and 7:15 p.m., Mianta met them at the side door, gave them the rope she had just bought, and told them Betty was upstairs in bed. All three went upstairs. Cavitt and Williams threw the sheet over Betty's head. While Cavitt secured the sheet around Betty's head with duct tape, Williams fastened Betty's wrists together with plastic flex cuffs. Then they used the rope to bind her ankles and wrists together with the sheet, creating a kind of hood for Betty's head. During the process, Cavitt and Williams also punched Betty in the back with their fists to get her to be quiet. Betty sustained extensive bruising to her face, shoulders, arms, legs, ankles and wrists, consistent with blunt force trauma.

After Betty was immobilized, Cavitt, Williams, and Mianta ransacked the bedroom, removing cash, cameras, Rolex watches, jewelry, and two handguns. Before leaving, Cavitt and Williams pretended to bind Mianta and placed her on the bed next to Betty. Cavitt and Williams each claimed that Betty was still breathing, although with difficulty, when they left her, facedown on the bed.

After Mianta freed herself, she turned Betty over onto her back. Mianta claimed she removed duct tape from Betty's mouth. Betty did not move and

did not appear to be breathing. Mianta called her father to tell him they had been robbed. She also told him Betty was unconscious. Philip immediately reported the incident to the Brisbane Police Department at 7:44 p.m. When the dispatcher called the McKnight house at 7:45 p.m., Mianta claimed that robbers had entered the house while she was downstairs watching television, had put a sheet over her head, and had knocked her unconscious; that she was eventually able to free herself; that she had called her father to report the crime; and that her stepmother was unconscious.

Brisbane police arrived at 7:52 p.m. Betty was on her back on the bed. She was not breathing and had no pulse. Her hands were bound behind her, and her wrists and ankles were tied together with a rope. Officers attempted cardiopulmonary resuscitation. Paramedics obtained a heartbeat at 8:11 p.m., but Betty had already suffered severe and irreversible brain injury. She was pronounced dead the next morning. The cause of death was insufficient oxygen, or anoxia, caused by asphyxiation. The injuries she sustained were a contributing cause.

During conversations with police and a neighbor, Mianta reiterated her claim that unidentified robbers had somehow entered the house, that they had wrapped her in a sheet and knocked her unconscious, and that she had been unable to untie herself until after the robbers left, at which point she discovered that her stepmother was unconscious. When police secured Philip's consent to conduct a polygraph of his daughter, however, Mianta eventually confessed to her involvement in the burglary-robbery. Cavitt and Williams were arrested on December 2 and also confessed. While being transported to juvenile hall, Cavitt said to Williams, "Man, we fucked up. We should have just shot her."

Police found the stolen jewelry, cameras, and handguns at Cavitt's home, as well as black clothing, gloves, and hockey masks.

Cavitt and Williams, who were tried separately, contended that Mianta must have killed Betty after they had left and for reasons unrelated to the burglary-robbery. To that end, they offered evidence tending to show that Mianta hated her stepmother, that Mianta had expressed to her schoolmates a desire to kill her stepmother, and that Betty could have been suffocated after Cavitt and Williams had returned to Cavitt's home with the loot.

Cavitt and Williams were convicted of first degree murder with the special circumstances of robbery murder and burglary murder, as well as certain lesser offenses. Cavitt was also convicted of personally inflicting great bodily

injury in the commission of the murder. Each was sentenced to an unstayed term of 25 years to life. (See Pen. Code, § 190.5, subd. (b).) The Court of Appeal, having ordered the cases consolidated for purposes of oral argument and decision, affirmed in an unpublished decision.

DISCUSSION

This case involves the " 'complicity aspect' " of the felony-murder rule. (*Pulido, supra*, 15 Cal.4th at p. 720.) As in *Pulido*, we are not concerned with that part of the felony-murder rule making a *killer* liable for first degree murder if the homicide is committed in the perpetration of a robbery or burglary. Rather, the question here involves "a *nonkiller's* liability for the felony murder committed by another." (*Id.* at p. 720.)

Defendants contend that a nonkiller can be liable for the felony murder committed by another only if the act resulting in death facilitated the commission of the underlying felony. Since (in their view) the evidence here would have supported the inference that Mianta killed her stepmother out of a private animus, and not to advance the burglary-robbery, they claim that the trial court's failure to instruct the jury on the requirement that the killing facilitate the burglary-robbery mandates reversal of their felony-murder convictions. The Attorney General, on the other hand, asserts that no causal relationship need exist between the underlying felony and the killing. In his view, it is enough that the act resulting in death occurred at the same time as the burglary and robbery.

■ After reviewing our case law, we find that neither formulation satisfactorily describes the complicity aspect of California's felony-murder rule. We hold instead that the felony-murder rule does not apply to nonkillers where the act resulting in death is completely unrelated to the underlying felony other than occurring at the same time and place. Under California law, there must be a logical nexus—i.e., more than mere coincidence of time and place—between the felony and the act resulting in death before the felony-murder rule may be applied to a nonkiller. Evidence that the killing facilitated or aided the underlying felony is relevant but is not essential.

■ We also hold that the requisite temporal relationship between the felony and the homicidal act exists even if the nonkiller is not physically present at the time of the homicide, as long as the felony that the nonkiller committed or attempted to commit and the homicidal act are part of one continuous transaction.

A

■ "All murder . . . which is committed in the perpetration of, or attempt to perpetrate [certain enumerated felonies including robbery and burglary] . . . is murder of the first degree." (Pen. Code, § 189.) The mental state required is simply the specific intent to commit the underlying felony (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1140 [124 Cal.Rptr.2d 373, 52 P.3d 572]), since only those felonies that are inherently dangerous to life or pose a significant prospect of violence are enumerated in the statute. (*People v. Roberts* (1992) 2 Cal.4th 271, 316 [6 Cal.Rptr.2d 276, 826 P.2d 274] ["the consequences of the evil act are so natural or probable that liability is established as a matter of policy"]; *People v. Washington* (1965) 62 Cal.2d 777, 780 [44 Cal.Rptr. 442, 402 P.2d 130]; 2 La Fave, Substantive Criminal Law (2d ed. 2003) § 14.5(b), p. 449.) "Once a person has embarked upon a course of conduct for one of the enumerated felonious purposes, he comes directly within a clear legislative warning—if a death results from his commission of that felony it will be first degree murder, regardless of the circumstances." (*People v. Burton* (1971) 6 Cal.3d 375, 387–388 [99 Cal.Rptr. 1, 491 P.2d 793] (*Burton*).)

■ The purpose of the felony-murder rule is to deter those who commit the enumerated felonies from killing by holding them strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony. (*Burton, supra*, 6 Cal.3d at p. 388.) "The Legislature has said in effect that this deterrent purpose outweighs the normal legislative policy of examining the individual state of mind of each person causing an unlawful killing to determine whether the killing was with or without malice, deliberate or accidental, and calibrating our treatment of the person accordingly. Once a person perpetrates or attempts to perpetrate one of the enumerated felonies, then in the judgment of the Legislature, he is no longer entitled to such fine judicial calibration, but will be deemed guilty of first degree murder for any homicide committed in the course thereof." (*Ibid.*)

1

Defendants contend that a nonkiller's liability for the felony murder committed by a cofelon depends on proof of a very specific causal relationship between the homicidal act and the underlying felony—namely, that the killer intended thereby to advance or facilitate the felony. Yet, defendants cite no case in which we have relieved a nonkiller of felony-murder liability because of insufficient proof that the killer actually intended to advance or facilitate the underlying felony. Indeed, the felony-murder rule is intended to eliminate the need to plumb the parties' peculiar intent with respect to a

killing committed during the perpetration of the felony. (*Burton, supra,* 6 Cal.3d at p. 388.)[2] Defendants' formulation, which finds no support in the statutory text, would thwart that goal.

Moreover, defendants' formulation is at odds with a fundamental purpose of the felony-murder rule, which is " 'to deter felons from killing negligently or accidentally by holding them strictly responsible for killings they commit.' " (*People v. Billa* (2003) 31 Cal.4th 1064, 1069 [6 Cal.Rptr.3d 425, 79 P.3d 542].) It is difficult to imagine how homicidal acts that are unintentional, negligent, or accidental could be said to have advanced or facilitated the underlying felony when those acts are, by their nature, unintended.

Defendants make little effort to grapple with the policies underlying the felony-murder rule and rely instead almost entirely on our oft-repeated observation in *People v. Vasquez* (1875) 49 Cal. 560 (*Vasquez*) that " '[i]f the homicide in question was committed by one of [the nonkiller's] associates engaged in the robbery, *in furtherance of their common purpose to rob*, he is as accountable as though his own hand had intentionally given the fatal blow, and is guilty of murder in the first degree.' " (*Id.* at p. 563, italics added.) Relying on *Vasquez*, defendants claim the felony-murder rule requires proof that the homicidal act have advanced or facilitated the underlying felony. Defendants misread *Vasquez*.

In the century and a quarter since *Vasquez* was decided, we have never construed it to require a killing to advance or facilitate the felony, so long as some logical nexus existed between the two. To the contrary, in *People v. Olsen* (1889) 80 Cal. 122, 125 [22 P. 125] (*Olsen*), overruled on other grounds in *People v. Green* (1956) 47 Cal.2d 209, 227, 232 [302 P.2d 307], we upheld an instruction that based a nonkiller's complicity on a killing that was committed merely *"in the prosecution of the common design"*—and, in *Pulido*, we observed that this instruction was "similar" to the *Vasquez* formulation. (*Pulido, supra,* 15 Cal.4th at p. 720.) The similarity, of course, is that both require a logical nexus between the homicidal act and the underlying felony. Although evidence that the fatal act facilitated or promoted the felony is unquestionably relevant to establishing that nexus, California case law has not yet required that such evidence be presented in every case.

Such a requirement finds no support in the statutory text, either. Penal Code section 189 states only that "[a]ll murder . . . which is committed in the

---

[2] As we have previously explained, it is no defense to felony murder that the nonkiller did not intend to kill, forbade his associates to kill, or was himself unarmed. (*People v. Boss* (1930) 210 Cal. 245, 249 [290 P. 881]; *People v. Floyd* (1970) 1 Cal.3d 694, 707 [83 Cal.Rptr. 608, 464 P.2d 64], disapproved on other grounds in *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36 [148 Cal.Rptr. 890, 583 P.2d 748].)

perpetration of, or attempt to perpetrate" the enumerated felonies "is murder of the first degree." (Pen. Code, § 189.) Nowhere has the Legislature imposed a requirement that the killer intend the act causing death to further the felony. We are therefore reluctant to derive such a requirement from the "in furtherance" discussion in our case law, which is itself only a court-created gloss on section 189.

■ Indeed, even jurisdictions whose felony-murder *statutes* require the homicidal act to be "in furtherance" of an enumerated felony do not require proof that the act furthered or aided the felony. *People v. Lewis* (1981) 111 Misc.2d 682, 686 [444 N.Y.S.2d 1003, 1006], which construed a New York felony-murder statute that included this language, is instructive: "This equation of 'in furtherance' with 'in aid of' or 'in advancement of' has the virtue of linguistic accuracy, but is at odds with both the history and purpose of the 'in furtherance' requirement. The phrase can best be understood as the third logical link in the triad which must be present to connect a felony with a consequent homicide. Just as 'in the course of' imposes a duration requirement, [and] 'causes the death' a causation requirement, 'in furtherance' places a relation requirement between the felony and the homicide. More than the mere coincidence to time and place [citation], the nexus must be one of logic or plan. Excluded are those deaths which are so far outside the ambit of the plan of the felony and its execution as to be unrelated to them." In sum, it is "a misinterpretation of the phrase to require that the murder bring success to the felonious purpose." (*Id.* at p. 687; see also *State v. Young* (1983) 191 Conn. 636 [469 A.2d 1189, 1193] ["New York courts have construed the phrase to impose the requirement of a logical nexus between the felony and the homicide"]; see also *State v. Montgomery* (2000) 254 Conn. 694 [759 A.2d 995, 1020] [" ' "The phrase 'in furtherance of' was intended to impose the requirement of a relationship between the underlying felony and the homicide beyond that of mere causation in fact" ' "].) We likewise construe Penal Code section 189 to require only a logical nexus between the felony and the homicide.

Defendants' proffered interpretation would also lead to absurd results. Consider the situation in which a fire is set and the defendant departs by the time a firefighter arrives and dies in the course of combating the fire. A Washington appellate court, embracing defendants' approach, interpreted the "in furtherance" requirement in its felony-murder statute to relieve a defendant-arsonist from liability in those circumstances: "Here, there is no evidence from which any reasonable juror could conclude that in acting to advance or promote the arson, [defendant] caused [the victim's] death." (*State v. Leech* (1989) 54 Wn.App. 597 [775 P.2d 463, 466].) The Washington Supreme Court rejected this approach and upheld the felony-murder

conviction, finding it sufficient that there was a temporal and causal connection between the arson and the death. (*State v. Leech* (1990) 114 Wn.2d 700 [790 P.2d 160, 163–165 & fn. 21], revg. *State v. Leech, supra,* 775 P.2d 463; accord, Morris, *The Felon's Responsibility for the Lethal Acts of Others* (1956) 105 U.Pa.L.Rev. 50, 79–80 (Morris).)

■ The Attorney General, on the other hand, contends that the requisite intent, combined with a killing by a cofelon that occurs while the felony is ongoing, is sufficient to establish the nonkiller's liability for felony murder. His formulation, in other words, would require only a temporal connection between the homicidal act and the underlying felony. This description of the relationship between the killing and the felony is incomplete. We have often required more than mere coincidence in time and place between the felony and the act resulting in death to establish a nonkiller's liability for felony murder. In *People v. Washington, supra,* 62 Cal.2d 777, for example, we reversed a conviction of felony murder where the accomplice was killed during the robbery by the *victim.* We held that Penal Code section 189 requires "that the felon or his accomplice commit the killing, for if he does not, the killing is not committed to perpetrate the felony." (*Washington, supra,* at p. 781.) In *Pulido, supra,* 15 Cal.4th 713, we held that section 189 does not apply even where a cofelon committed the killing during a robbery, if the nonkiller did not join the felony until *after* the killing occurred. (*Pulido, supra,* at p. 716.)

The Attorney General correctly points out that we have approved instructions imposing felony-murder liability on a nonkiller "if a human being is killed by any one of several persons jointly engaged at the time of such killing in the perpetration of or an attempt to perpetrate the crime of robbery, whether such killing is intentional, or unintentional, or accidental." (*People v. Perry* (1925) 195 Cal. 623, 637 [234 P. 890]; *People v. Martin* (1938) 12 Cal.2d 466, 472 [85 P.2d 880].) But this "well-settled" formulation (*Martin, supra,* at p. 472) does not suggest that *no* causal connection need exist between the felony and the act resulting in death. By its terms, the *Martin-Perry* formulation requires the parties to have been jointly engaged in the perpetration or the attempt to perpetrate the felony at the time of the act resulting in death. A confederate who performs a homicidal act that is completely unrelated to the felony for which the parties have combined cannot be said to have been "jointly engaged" in the perpetration or attempt to perpetrate the felony at the time of the killing. Otherwise, "if one of two burglars ransacking a home glances out of a window, sees his enemy for whom he has long been searching and shoots him, the unarmed accomplice, party only to the burglary, will be guilty of murder in the first degree." (Morris, *supra,* 105 U.Pa. L.Rev. at p. 73.)

■ California law thus has long required some logical connection between the felony and the act resulting in death, and rightly so. Yet the requisite connection has not depended on proof that the homicidal act furthered or facilitated the underlying felony. Instead, for a nonkiller to be responsible for a homicide committed by a cofelon under the felony-murder rule, there must be a logical nexus, beyond mere coincidence of time and place, between the felony the parties were committing or attempting to commit and the act resulting in death.

We therefore reject the assumption—shared by both parties—that the " 'in furtherance' " (e.g., *Vasquez, supra,* 49 Cal. at p. 563) and "jointly engaged" (e.g., *People v. Martin, supra,* 12 Cal.2d at p. 472) formulations articulate opposing standards of felony-murder liability. The latter does *not* mean—as the Attorney General suggests—that mere coincidence of time and place between the felony and the homicide is sufficient. And the former does *not* require—as defendants suggest—that the killer intend the homicidal act to aid or promote the felony. Rather, *Vasquez* and *Martin* have merely used different words to convey the same concept: to exclude homicidal acts that are completely unrelated to the felony for which the parties have combined, and to require instead a logical nexus between the felony and the homicide beyond a mere coincidence of time or place.

2

One of the most discussed cases in this area—*People v. Cabaltero* (1939) 31 Cal.App.2d 52 [87 P.2d 364] (*Cabaltero*)[3]—merits additional analysis.

In *Cabaltero,* six defendants were convicted of felony murder, based on the killing of an accomplice (Ancheta) during the perpetration of the robbery of a rural landowner (Nishida). The conspirators plotted to rob Nishida on payday by creating an altercation that would divert attention from the robbery. One of the conspirators was to create the distraction; two others were to rob Nishida; two more were to stand guard outside the building where the robbery was to take place; and Cabaltero was to drive the getaway car. (*Cabaltero, supra,* 31 Cal.App.2d at pp. 55–56.) The robbery proceeded as planned, and the loot was obtained at gunpoint without anyone firing a shot. Meanwhile, Ancheta, who was standing guard outside, fired shots at two people who had just driven up. Immediately after the shots were fired, one of the robbers emerged from the building, exclaimed, "Damn you, what did you shoot for," and shot Ancheta fatally. (*Id.* at p. 56.)

---

[3] See, e.g., *Pulido, supra,* 15 Cal.4th at page 722 and footnote 2, and citations therein.

Some courts and commentators have criticized *Cabaltero*, charging that it sustained felony-murder liability for nonkillers based merely on "the deliberate acts of one accomplice, outside the conspiracy, 'outside the risk' of the conspiracy, and serving only his personal animus." (Morris, *supra*, 105 U.Pa. L.Rev. at p. 73.) As we have explained above, we agree that a nonkiller cannot be liable under the felony-murder rule where the killing has no relation to the felony other than mere coincidence of time and place. *Cabaltero* does not appear to be such a case, however. Viewing the situation objectively, it seems plain that Ancheta was shot as punishment for the greatly increased risk of detection caused by his decision to fire at two people who were approaching the building. To the extent the Ancheta shooting was intended to aid in the escape from the robbery (*Cabaltero*, *supra*, 31 Cal.App.2d at pp. 61–62), the homicide would satisfy even the strict causal connection demanded by defendants. Accordingly, a logical nexus between the homicide and the felony existed in that case.

3

Substantial evidence of a logical nexus between the burglary-robbery and the murder exists in this case as well. The record supports a finding that defendants and/or Mianta killed Betty to eliminate the sole witness to the burglary-robbery or that Betty died accidentally as a result of being bound and gagged during the burglary-robbery. Either theory is sufficient to support the judgment. (E.g., *People v. Kimble* (1988) 44 Cal.3d 480, 502 [244 Cal.Rptr. 148, 749 P.2d 803] (*Kimble*).) Even if the jury believed that defendants did not want to kill Betty or that they conditioned their participation in the burglary-robbery on the understanding that Betty not get hurt, it would not be a defense to felony murder. (*People v. Boss*, *supra*, 210 Cal. at p. 249; *Vasquez*, *supra*, 49 Cal. at pp. 562–563.)

As defendants point out, however, the record might also have supported a finding that Mianta killed Betty out of a private animus and not to aid or promote the burglary-robbery. Defendants contend that the jury instructions, by omitting any requirement that the homicidal act be "in furtherance of" the burglary-robbery, failed to apprise the jury of this latter possibility and therefore mandate reversal of their convictions.

■■ We disagree. Although we have used the "in furtherance" phrase with some frequency in our opinions, we also recognize that this wording has the potential to sow confusion if used in the instructions to the jury. (See *Francis v. City & County of San Francisco* (1955) 44 Cal.2d 335, 341 [282 P.2d 496] ["The admonition has been frequently stated that it is dangerous to frame an instruction upon isolated extracts from the opinions of the court"]; *Merritt v. Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 876, fn. 5

[110 Cal.Rptr. 511].) Indeed, as we have explained above, the felony-murder rule does not require proof that the homicidal act furthered or facilitated the felony, only that a logical nexus exist between the two. We therefore do not find the jury instructions deficient merely because the "in furtherance" phrasing was omitted. We must instead measure the instructions against the applicable law as set forth in part A.1, *ante*.

The instructions in Cavitt's case tracked CALJIC No. 8.27 and provided in relevant part: "If a human being is killed by one of several persons engaged in the commission of the crimes of robbery or burglary, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging or facilitating the commission of the offense, aid, promote, encourage or instigate by act or advice its commission, are guilty of murder in the first degree, whether the killing is intentional, unintentional or accidental." Williams's jury received a substantively similar instruction.[4]

The instructions adequately apprised the jury of the need for a logical nexus between the felonies and the homicide in this case. To convict, the jury necessarily found that "the killing occurred *during* the commission or attempted commission of robbery or burglary" by "one of several persons *engaged in the commission*" of those crimes. The first of these described a temporal connection between the crimes; the second described the logical nexus. A burglar who happens to spy a lifelong enemy through the window of the house and fires a fatal shot, as in Professor Morris's example (Morris, *supra*, 105 U.Pa. L.Rev. at p. 73), may have committed a killing while the robbery and burglary were taking place but cannot be said to have been "engaged in the commission" of those crimes at the time the shot was fired.

 We further find that the trial court had no sua sponte duty to clarify the logical-nexus requirement. The existence of a logical nexus between the felony and the murder in the felony-murder context, like the relationship between the robbery and the murder in the context of the felony-murder special circumstance (*People v. Green* (1980) 27 Cal.3d 1, 59–62 [164 Cal.Rptr. 1, 609 P.2d 468]), is not a separate element of the charged crime but, rather, a clarification of the scope of an element. (*Kimble, supra,* 44 Cal.3d at p. 501.) "[T]he mere act of 'clarifying' the scope of an element of a

---

[4] "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime[s] of burglary or robbery, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder in the first degree, whether the killing is intentional, unintentional, or accidental."

crime or a special circumstance does not create a new and separate element of that crime or special circumstance." (*Ibid.*)

Hence, if the requisite nexus between the felony and the homicidal act is not at issue and the trial court has otherwise adequately explained the general principles of law requiring a determination whether the killing was committed in the perpetration of the felony, "it is the defendant's obligation to request any clarifying or amplifying instructions on the subject." (*People v. Garrison* (1989) 47 Cal.3d 746, 791 [254 Cal.Rptr. 257, 765 P.2d 419].) "Sua sponte instructions are required only ' " 'on the general principles of law relevant to the issues *raised by the evidence*. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the *facts* before the court, and which are necessary for the jury's understanding of the case.' " ' " (*Kimble, supra,* 44 Cal.3d at p. 503; see also *People v. Guzman* (1988) 45 Cal.3d 915, 952 [248 Cal.Rptr. 467, 755 P.2d 917] [no sua sponte duty to define the meaning of the phrase " 'while [defendant] was engaged in . . . the commission of' rape"], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].) In sum, there is no sua sponte duty to clarify the principles of the requisite relationship between the felony and the homicide without regard to whether the evidence supports such an instruction. (*Garrison, supra,* 47 Cal.3d at p. 791.)

██ Because the evidence here did not raise an issue as to the existence of a logical nexus between the burglary-robbery and the homicide, the trial court had no sua sponte duty to clarify this requirement. This is not a situation in which Mianta just happened to have shot and killed her lifelong enemy, whom she coincidentally spied through the window of the house during the burglary-robbery. (Cf. Morris, *supra,* 105 U.Pa. L.Rev. at p. 73.) Betty, the murder victim, was the intended target of the burglary-robbery. As part of those felonies, Betty was covered in a sheet, beaten, hog-tied with rope and tape, and left facedown on the bed. Her breathing was labored at the time defendants left. These acts either asphyxiated Betty in themselves or left her unable to resist Mianta's murderous impulses. Thus, on this record, one could not say that the homicide was completely unrelated, other than the mere coincidence of time and place, to the burglary-robbery.[5]

---

[5] As Cavitt concedes, cases that raise a genuine issue as to the existence of a logical nexus between the felony and the homicide "are few indeed." It is difficult to imagine how such an issue could ever arise when the target of the felony was intentionally murdered by one of the perpetrators of the felony. Nor, other than in circumstances akin to Professor Morris's hypothetical, does it seem likely that a genuine dispute could arise when the victim was killed during the escape from the felony or was killed negligently or accidentally during the perpetration of the felony.

██ Defendants apparently assume that Mianta's personal animus towards the victim of the felony, if credited, should somehow absolve the other participants of their responsibility for the victim's death. They are mistaken. Liability for felony murder does not depend on an examination of "the individual state of mind of each person causing an unlawful killing to determine whether the killing was with or without malice, deliberate or accidental . . . . Once a person perpetrates or attempts to perpetrate one of the enumerated felonies, then in the judgment of the Legislature, he is no longer entitled to such fine judicial calibration . . . ." (*Burton, supra,* 6 Cal.3d at p. 388.) "The felony-murder rule generally acts as a substitute for the *mental state* ordinarily required for the offense of murder." (*People v. Patterson* (1989) 49 Cal.3d 615, 626 [262 Cal.Rptr. 195, 778 P.2d 549].) Accordingly, a nonkiller's liability for felony murder does not depend on the killer's subjective motivation but on the existence of objective facts that connect the act resulting in death to the felony the nonkiller committed or attempted to commit. Otherwise, defendants' responsibility would vary based merely on whether the trier of fact believed that Mianta killed Betty by accident, because of a personal grudge, to eliminate a witness, or simply to find out what killing was like.[6]

One would hardly be surprised to discover that targets of inherently dangerous felonies are selected precisely *because* one or more of the participants in the felony harbors a personal animus towards the victim. But it would be novel indeed if that commonplace fact could be used to exculpate the parties to a felonious enterprise of a murder committed in the perpetration of that felony, where a logical nexus between the felony and the murder exists. (Cf. *People v. Gutierrez, supra,* 28 Cal.4th at p. 1141 ["concurrent intent to kill and to commit the target felony or felonies does not undermine the basis for a felony-murder conviction"].) Defendants' focus on the killer's subjective motivation thus is not merely contrary to the felony-murder rule but would in practice swallow it up. Under the circumstances here, we reject the defense contention that the trial court erred in failing to give, sua sponte, a clarifying instruction to explain more fully the requisite connection between

---

[6] We also reject Cavitt's summary assertion that *Olsen, supra,* 80 Cal. 122, excluded killings that are a " 'fresh and independent product' of the killer's mind" from the ambit of the felony-murder rule. Cavitt misreads *Olsen,* which explicitly did not address "the supposed case of counsel where the greater crime was, or might have been, 'a fresh and independent product of the mind of one of the conspirators . . . .' " (*Olsen, supra,* 80 Cal. at p. 125.)

Moreover, as stated above, the felony-murder rule renders it unnecessary to examine the individual state of mind of each person causing an unlawful killing—which is precisely what the "fresh and independent product" limitation would require courts to do. Here, for example, the defense theory was that Mianta decided to kill Betty for reasons independent of the felony. As we explain in the text, however, this theory even if credited would not relieve defendants of liability for felony murder in this case.

the felonies and the homicide. (*People v. Alvarez* (1996) 14 Cal.4th 155, 222–223 [58 Cal.Rptr.2d 385, 926 P.2d 365]; *Kimble, supra*, 44 Cal.3d at p. 503.)

B

Defendants challenge next the instructions concerning the temporal relationship between the homicide and the felonies. The defense theory was that Mianta killed Betty in the five or 10 minutes after defendants had left the house and, along with the stolen property, had reached a place of temporary safety but before Mianta reported the crime. Thus, in their view, the burglary and robbery had ended before Betty was killed, relieving them of liability for felony murder.

The People contended that Betty was killed—or the acts resulting in her death were performed—while defendants were present or, at the least, before defendants reached a place of temporary safety. They also argued that defendants were guilty of felony murder, even if the homicide occurred after they had reached a place of temporary safety, as long as the felonies and the homicide constituted part of one continuous transaction. The trial court in both cases agreed, and instructed each jury that a killing "is committed in the commission of a felony if the killing and the felony are parts of one continuous transaction. There is no requirement that the homicide occur while committing or while engaged in the felony or that the killing be part of the felony, so long as the two acts are part of one continuous transaction."[7]

---

[7] Cavitt's jury was further instructed as follows: "When a killing occurs after the elements of the felony have been committed, the felony-murder rule applies if the killing and the felony were part of 'one continuous transaction.' Some factors that you may consider in determining whether the killing and the felony were part of, 'one continuous transaction' might include, but are not limited to, the following considerations:

"(1) whether or not any aider and abettor exercised continuous control over the victim. [¶] (2) whether or not the killing occurs in pursuance of a felony. [¶] (3) the distance between the location of the perpetration of the felony and the location of the killing. [¶] (4) the time lapse between the perpetration of the felony and the killing. [¶] (5) whether the killing is a direct causal result of the felony. [¶] (6) whether the killing occurs while the perpetrators are attempting to protect themselves against discovery of the felony or reporting of the crime. [¶] (7) whether the killing is a natural and probable consequence of the felony.

"No one of these factors, or any combination of factors is to be considered by you to be determinative of the phrase 'one continuous transaction.' There is no requirement that the defendant be present at the scene of the killing so long as the defendant's participation in the felony sets in motion a chain of events which resulted in the killing."

In addition to the instruction quoted in the text, Williams's jury was instructed in accordance with CALJIC Nos. 8.21.1 and 8.21.2, which define, respectively, the duration of a robbery and a burglary. The burglary instruction closely tracked, with appropriate modifications, the robbery instruction, which provided: "For the purposes of determining whether an unlawful killing has occurred during the commission or attempted commission of a robbery, the commission of the crime of robbery is not confined to a fixed place or a limited period of time.

We find no error. Our case law has consistently rejected a " 'strict construction of the temporal relationship' between felony and killing as to both first degree murder and [the] felony-murder special circumstance." (*People v. Sakarias* (2000) 22 Cal.4th 596, 624 [94 Cal.Rptr.2d 17, 995 P.2d 152].) Instead, we have said that "a killing is committed in the perpetration of an enumerated felony if the killing and the felony 'are parts of one continuous transaction.' " (*People v. Hayes* (1990) 52 Cal.3d 577, 631 [276 Cal.Rptr. 874, 802 P.2d 376].) Indeed, we have invoked the continuous-transaction doctrine not only to aggravate a killer's culpability, but also to make complicit a nonkiller, where the felony and the homicide are parts of one continuous transaction. (E.g., *People v. Whitehorn* (1963) 60 Cal.2d 256, 260, 264 [32 Cal.Rptr. 199, 383 P.2d 783] [defendant, who had raped the victim, was guilty of felony murder when accomplice strangled the victim after the rape]; see also *People v. Ross* (1979) 92 Cal.App.3d 391, 402 [154 Cal.Rptr. 783]; *People v. Manson* (1976) 61 Cal.App.3d 102, 208–209 [132 Cal.Rptr. 265]; *People v. Medina* (1974) 41 Cal.App.3d 438, 452 [116 Cal.Rptr. 133]; see generally 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) § 139, p. 754.)

Our reliance on the continuous-transaction doctrine is consistent with the purpose of the felony-murder statute, which "was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker, and this court has viewed it as obviating the necessity for, rather than requiring, any technical inquiry concerning whether there has been a completion, abandonment, or desistence of the [felony] before the homicide was completed." (*People v. Chavez* (1951) 37 Cal.2d 656, 669–670 [234 P.2d 632].) In particular, the rule " 'was not intended to relieve the wrongdoer from any probable consequence of his act by placing a limitation upon the *res gestae* which is unreasonable or unnatural.' The homicide is committed in the perpetration of the felony if the killing and felony are parts of one continuous transaction" (*id.* at p. 670), with the proviso "that felony-murder liability attaches only to those engaged in the felonious scheme before or during the killing." (*Pulido, supra,* 15 Cal.4th at p. 729.)

[¶] A robbery is still in progress after the original taking of physical possession of the stolen property while the perpetrators are in possession of the stolen property and fleeing in an attempt to escape. Likewise, it is still in progress so long as immediate pursuers are attempting to capture the perpetrators or to regain the stolen property. [¶] A robbery is complete when the perpetrators have eluded any pursuers, have reached a place of temporary safety, and are in unchallenged possession of stolen property after having effected an escape with such property." The trial court then modified each instruction by adding a concluding paragraph: "The perpetrators have not reached a place of temporary safety if, having committed the robbery [or burglary] with other perpetrators, any one of the perpetrators continues to exercise control over the victim. Only when all perpetrators have relinquished control over the victim[,] are in unchallenged possession of the stolen property[,] and have effected an escape can it be said that any one of them has reached a place of temporary safety."

This is not to say that Mianta, by remaining in the house with Betty, could have prolonged defendants' liability indefinitely. For example, if Mianta had untied Betty, revived her, and two weeks later poisoned her in retaliation for some perceived slight, the burglary-robbery and the murder would not be part of "one continuous transaction." Cavitt's fear that, because Mianta lived with the victim, the felonies "could be deemed to continue indefinitely" is therefore unfounded. Hence, no error appears in the Cavitt instructions.

The jury in Williams's trial, however, received not only the instruction concerning the continuous-transaction rule, but also CALJIC Nos. 8.21.1 and 8.21.2. (See fn. 7, *ante*.) Those instructions provided that the burglary and robbery continued while the "perpetrators" were in flight and that those crimes were "complete" when the "perpetrators" had reached a place of temporary safety. The court then added the following paragraph: "The perpetrators have not reached a place of temporary safety if, having committed the robbery [or burglary] with other perpetrators, any one of the perpetrators continues to exercise control over the victim. Only when all perpetrators have relinquished control over the victim[,] are in unchallenged possession of the stolen property[,] and have effected an escape can it be said that any one of them has reached a place of temporary safety." In Williams's view, the requirement that *all* perpetrators must reach a place of temporary safety before any of them can be said to have done so—and thus, before the underlying felony can be said to be completed—is a misstatement of law.

██ To resolve this claim, we first recognize that we are presented with two related, but distinct, doctrines: the continuous-transaction doctrine and the escape rule. The "escape rule" defines the duration of the underlying felony, in the context of certain ancillary consequences of the felony (*People v. Cooper* (1991) 53 Cal.3d 1158, 1167 [282 Cal.Rptr. 450, 811 P.2d 742]), by deeming the felony to continue until the felon has reached a place of temporary safety. (E.g., *People v. Bodely* (1995) 32 Cal.App.4th 311, 313 [38 Cal.Rptr.2d 72].) ██ The continuous-transaction doctrine, on the other hand, defines the duration of *felony-murder* liability, which may extend beyond the termination of the felony itself, provided that the felony and the act resulting in death constitute one continuous transaction. (*Ibid.* ["the duration of felony-murder liability is not determined by considering whether the felony itself has been completed"]; *People v. Castro* (1994) 27 Cal.App.4th 578, 585 [32 Cal.Rptr.2d 529] ["it is settled that a murder is deemed to occur in the commission of rape even after the rape is completed so long as the rape and murder are part of a continuous transaction"]; *People v. Taylor* (1980) 112 Cal.App.3d 348, 358 [169 Cal.Rptr. 290].) It thus would have been sufficient to have instructed the Williams jury on the continuous-transaction doctrine alone, as the Cavitt jury was instructed. (See generally *People v. Montoya* (1994) 7 Cal.4th 1027, 1045, fn. 9 [31 Cal.Rptr.2d 128, 874 P.2d 903] ["the *duration* of the offense of burglary, as

defined for the purpose of assigning aider and abettor liability, need not and should not be identical to the definition pertinent to felony-murder liability"].) Williams, however, asked for and received CALJIC Nos. 8.21.1 and 8.21.2.

 There is case support for the proposition that, under the escape rule, a felony continues as long as any one of the perpetrators retains control over the victim or is in flight from the crime scene. (E.g., *People v. Auman* (Colo.Ct.App. 2002) 67 P.3d 741, 751–752, cert. granted (Colo. 2003) 2003 Colo.LEXIS 262; *White v. State* (2001) 140 Md.App. 520 [781 A.2d 902, 911]; see Morris, *supra*, 105 U.Pa. L.Rev. at pp. 75–77.) We need not decide whether this instruction accurately states the law in California, however, because we find that any error could not have prejudiced Williams. As stated, his jury was correctly instructed on the continuous-transaction doctrine. Moreover, the only "control" Mianta had over Betty was attributable to the fact that defendants had bound and gagged Betty during the burglary-robbery. Even if Mianta had decided to kill Betty for personal reasons, there was no evidence that she formed this private intent *after* defendants had left and reached a place of temporary safety. Inasmuch as concurrent intent to kill and to commit the target felonies "does not undermine the basis for a felony-murder conviction" (*People v. Gutierrez, supra*, 28 Cal.4th at p. 1141), a finding that Betty remained under Mianta's control at the time of the homicide was, in this particular situation, equivalent to a finding that the homicide was part of a continuous transaction with the burglary-robbery. (*People v. Castro, supra*, 27 Cal.App.4th at p. 585; see *People v. Jones* (2001) 25 Cal.4th 98, 109–110 [104 Cal.Rptr.2d 753, 18 P.3d 674]; *People v. Portillo* (2003) 107 Cal.App.4th 834, 846 [132 Cal.Rptr.2d 435].) Thus, under the facts of this case, the additional paragraph did not supply an impermissible route to conviction. We therefore find that even if the additional paragraph misstated California law, it was harmless beyond a reasonable doubt. (*People v. Sakarias, supra*, 22 Cal.4th at pp. 625–626.)

C

At both trials, Mianta's schoolmates testified that Mianta hated her stepmother and had said she wanted to kill her. In Cavitt's trial, however, the court informed the jury that this testimony could not be used in evaluating the charge of felony murder but could be used only for the robbery-murder and burglary-murder special circumstances. Cavitt argues that the limiting instruction was error and requires reversal of his felony-murder conviction. We find that any error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

 Evidence that Mianta wanted to kill Betty, even if credited, would not have affected the undisputed logical nexus between the burglary-robbery

and the homicide. That connection was based on the fact that the crimes involved the same victim, occurred at the same time and place, and were each facilitated by binding and gagging Betty. Evidence that Betty was intentionally murdered by Mianta because of a private grudge, instead of killed accidentally or killed intentionally to facilitate the burglary-robbery, would not have undermined that connection. Hence, the exclusion of this evidence from the jury's consideration, even if error, could not have been prejudicial.

On the other hand, evidence that Mianta had a private motive *was* relevant to the jury's determination that the homicide and the burglary-robbery were part of a single continuous transaction. Nonetheless, it is not reasonably probable that the result would have been different had the testimony of Mianta's schoolmates been admitted without the limiting instruction. As stated, the jury *was* permitted to use this testimony in considering the robbery-murder and burglary-murder special circumstances. In order to find the special circumstances true, the jury necessarily found that the murder was committed "during the commission of or in order to carry out or advance the commission of the crimes of robbery or burglary or to facilitate the escape therefrom or to avoid detection." Accordingly, the jury, despite this testimony, found either that the homicide was committed "during the commission" of the burglary-robbery *or* that it was designed to facilitate those crimes or the escape therefrom. Either finding demonstrates that the homicide was part of a continuous transaction with the burglary-robbery. Moreover, despite the admission of this same testimony for all purposes, Williams's jury convicted him of felony murder.

The likelihood of prejudice was further diminished by the fact the jury did hear from other witnesses that Mianta's relationship with Betty was poor, that she was angry with Betty, and (from Cavitt himself) that Mianta wanted to kill Betty. None of this testimony was subject to the limiting instruction concerning the testimony of Mianta's schoolmates. In sum, Cavitt cannot show prejudice.

### Disposition

The judgment of the Court of Appeal is affirmed.

George, C. J., Chin, J., Brown, J., and Moreno, J., concurred.

**WERDEGAR, J.**—I concur in the majority's result and in most of its reasoning, but I cannot agree that CALJIC No. 8.27, the standard instruction outlining complicity in felony murder, "adequately apprised the jury of the need for a logical nexus between the felonies and the homicide." (Maj. opn.,

*ante*, at p. 203.) That instruction tells the jury that when a killing is perpetrated by "one of several persons *engaged in the commission*" of the predicate felony (CALJIC No. 8.27, italics added), all those complicit in the felony are also complicit in murder. In my view, the italicized language is calculated only to inform the jury of the necessary temporal connection between the predicate felony and the murder, not of the necessary causal or logical connection. Like the so-called *Martin-Perry* formulation[1] from which the standard instruction apparently derives, CALJIC No. 8.27" appear[s] to state a broader rule of felony-murder complicity, under which the killing need have no particular causal or logical relationship to the common [felonious] scheme." (*People v. Pulido* (1997) 15 Cal.4th 713, 722 [63 Cal.Rptr.2d 625, 936 P.2d 1235].)

The majority (*ante*, at p. 203) suggests that a felon who kills during the commission of the felony but for reasons or in a manner logically and causally unrelated to the felony is not "engaged in the commission of" the felony when he or she kills; the killing, therefore, would not create cofelon liability under CALJIC No. 8.27. (See also maj. opn., *ante*, at p. 200 [same argument as to *Martin-Perry* formulation].) This reading of the instruction, I fear, is too subtle to be apprehended by the ordinary juror, especially when CALJIC No. 8.27 is coupled with standard instructions designed to be given in felony-murder cases on duration of the predicate felony. (See, e.g., CALJIC Nos. 8.21.1 (7th ed. 2004) [robbery still in progress while perpetrator is fleeing with the loot, until perpetrator reaches place of temporary safety], 8.21.2 (7th ed. 2004) [burglary still in progress while perpetrator is fleeing in an attempt to escape, until perpetrator reaches place of temporary safety].) Without further instruction, a reasonable layperson would assume that the law considers a burglar, for example, to be engaged in the commission of the crime from the moment of entering the building at least until leaving it, despite any momentary diversion from the felonious enterprise the burglar may experience during that period.

As the majority explains, an accomplice in the predicate felony is liable for a killing committed by another of the felons only if the killing is logically or causally related to the contemplated felony; complicity depends on "the existence of objective facts that connect the act resulting in death to the felony the nonkiller committed or attempted to commit." (Maj. opn., *ante*, at p. 205.) The rule is similar, though not identical, to that governing complicity in crimes committed by a fellow conspirator or accomplice generally. When two or more persons set out to commit a robbery, for example, and one of them not only robs but tries to kill a victim, the other robbers are held

---

[1] See *People v. Perry* (1925) 195 Cal. 623, 637 [234 P. 890] (all those are complicit in murder who were, with the killer, "jointly engaged at the time of such killing" in the underlying felony); *People v. Martin* (1938) 12 Cal.2d 466, 472 [85 P.2d 880] (same).

complicit in attempted murder if and only if that attempt was a natural and probable outgrowth of the target robbery. (*People v. Prettyman* (1996) 14 Cal.4th 248, 261–263 [58 Cal.Rptr.2d 827, 926 P.2d 1013]; *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392].) Analogously, a robber is liable for a *murder* committed by his or her confederate if and only if the murder, objectively viewed, proceeded logically or causally from the commission of the target crime, the robbery.[2]

CALJIC No. 8.27 simply fails to inform a jury of this principle. Any error in failing to give a clearer instruction on the point was, as the majority explains, harmless here, for there was no substantial evidence to support the theory that Mrs. McKnight's killing was logically or causally unrelated to the conspirators' commission of burglary and robbery, in which defendants Cavitt and Williams were full participants. (Maj. opn., *ante*, at pp. 204–205.) In future cases, nevertheless, it would be appropriate for trial courts to clearly explain that murder complicity under the felony-murder rule requires not only a temporal relationship between commission of the felony and the killer's fatal act, but also a logical or causal one. I suggest this principle, however phrased, be included in standard instructions on felony-murder complicity.

Kennard, J., concurred.

---

[2] Commentators have observed that the two complicity rules (that governing felony murder and that governing aiding and abetting generally) involve similar imputations of conduct and culpability (Robinson, *Imputed Criminal Liability* (1984) 93 Yale L.J. 609, 617–618) and may be seen as general and specific aspects of the same problem—"the problem of the responsibility of one criminal . . . for the conduct of a fellow-criminal . . . who, in the process of committing or attempting the agreed-upon crime, commits another crime" (2 La Fave, Substantive Criminal Law (2d ed. 2003) § 14.5(c), p. 450). The language used to define the scope of the two rules also is linked historically in California law. (See *People v. Olsen* (1889) 80 Cal. 122, 124–125 [22 P. 125] [instruction that nonkiller was complicit in felony murder committed "in the prosecution of the common design" necessarily excluded killings that were "outside of and foreign to the common design" and hence not the " 'ordinary and probable effect' " of the agreed-upon felony], overruled on other grounds in *People v. Green* (1956) 47 Cal.2d 209, 227 [302 P.2d 307]; *People v. Kauffman* (1907) 152 Cal. 331, 334 [92 P. 861] [seminal decision on natural and probable consequences rule: conspirator not liable for crimes committed by another conspirator unless they were done "in execution" or "in furtherance" of the common design]; *People v. Terry* (1970) 2 Cal.3d 362, 401–402 & fn. 18 [85 Cal.Rptr. 409, 466 P.2d 961] [approving, in felony-murder case, instruction that nonkiller was not responsible for murder if it was neither "in furtherance of" nor a "natural and probable consequence of" the planned robbery], disapproved on another point in *People v. Carpenter* (1997) 15 Cal.4th 312, 382 [63 Cal.Rptr.2d 1, 935 P.2d 708].) Nevertheless, complicity appears broader under the felony-murder rule than under the natural and probable consequences doctrine, which we have described as resting on foreseeability (*People v. Croy, supra*, 41 Cal.3d at p. 12, fn. 5), in that a felon may be held responsible for a killing by his or her cofelon, under the felony-murder rule, even if the killing was not foreseeable to the nonkiller because "the plan as conceived did not contemplate the use or even the carrying of a weapon or other dangerous instrument." (2 La Fave, Substantive Criminal Law, *supra*, § 14.5(c), p. 452.)

**CHIN, J.**— I agree fully with the majority opinion, which I have signed. I write separately only to comment on the standard jury instructions, and in particular on CALJIC No. 8.27. I agree with the majority that instruction is generally adequate. But it can be improved.

As the majority holds, a nonkiller is not liable for *all* killings during the course of a felony the nonkiller is perpetrating. There must be a causal relationship between the felony and the death, i.e., there must be some logical nexus, beyond mere coincidence of time and place, between the killing and the underlying felony. (Maj. opn., *ante*, at p. 193.) This requirement will rarely be significantly at issue in a felony-murder case. Rarely will a killing during a felony have no connection to that felony, but merely be coincidental. Indeed, it may be only in law-school-type hypotheticals such as the one suggested in the article the majority cites (maj. opn., *ante*, at p. 200)— hypothesizing one of two burglars who, while committing the burglary, just happens to spot a long-sought enemy and shoots him for reasons completely unrelated to the burglary—that the required causal relationship might be missing. Such scenarios are exceedingly unlikely in real life. And certainly if, as is usually the case (and was here), the felony's target was killed, it is hard even to hypothesize a factual scenario in which there would be no connection between the felony and the killing.

But the fact that the causal relationship requirement will rarely be truly at issue does not mean the instructions should not be the best and clearest possible. Accordingly, I suggest that in the future, courts might more clearly inform the jury that the felony-murder rule requires both a causal and a temporal relationship between the underlying felony and the act resulting in death. The causal relationship requires some logical connection between the killing and the underlying felony beyond mere coincidence of time and place. The temporal relationship requires that the felony and the killing be part of one continuous transaction.