Filed 7/7/15  P. v. Mayes CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C073853 |
| Plaintiff and Respondent, | (Super. Ct. No. SF119150A) |
| v. | |
| STEDVIENO MAYES, | |
| Defendant and Appellant. | |

Following a jury trial, defendant Stedvieno Mayes was convicted of first degree felony murder (Pen. Code, § 187, subd. (a)),[1] two counts of kidnapping to commit robbery (§ 209, subd. (b)), and single counts of first degree robbery (§§ 211, 212.5, subd. (a)), felon in possession of a firearm (former § 12021, subd. (a)(1)), possession of an

---

[1]     Undesignated statutory references are to the Penal Code.

1

assault weapon (former § 12280, subd. (b)),[2] possession of heroin for sale (Health & Saf. Code, § 11351), and possession of cocaine base for sale (Health & Saf. Code, § 11351.5), with enhancements for personally using a firearm (§ 12022.53, subd. (b)). The trial court sustained a strike allegation and sentenced defendant to 98 years to life plus 25 years four months.

On appeal, defendant contends sentencing on the single count of robbery should have been stayed pursuant to section 654, there was insufficient evidence to support the finding he used a firearm in a menacing manner, there was insufficient evidence to support the finding he personally used a firearm in the kidnappings for robbery, and it was prejudicial error for the trial court to fail to instruct sua sponte on the logical nexus between the underlying felony and the homicide.[3] We stay sentence on the single count of robbery and affirm the judgment as modified.

FACTUAL BACKGROUND

On June 18, 2011, at approximately 11:00 p.m., Brandy Warren and her friend Britney Allison walked out of Warren's house and went to Warren's car, which was parked down the street. Defendant and codefendant Xavier Spivey approached them at Warren's car. Both men wore the hoods of their sweatshirts over their heads. Spivey put a gun with a long clip to Warren's back and ordered her to go back to her home and open the door. Defendant went to Allison, and the four returned to Warren's house in single file, with Spivey behind Warren and defendant following Allison. Warren did not hear defendant say anything nor did she see anything in his hands from the time he approached her until they entered her home.

---

[2]    Effective January 1, 2012, former section 12280, subdivision (b) was repealed and replaced without substantive change with section 30605. (Stats. 2011, ch. 15, § 550.)

[3]    Defendant and Xavier Spivey were jointly tried with separate juries (C073902).

Defendant and Spivey told the women to lie down on the kitchen floor. Defendant held a silver .22-caliber pistol, resting his arm while holding the firearm on a countertop. He told Warren and Allison they would be okay. Spivey ransacked the home, asking, " 'Where is the money? Where's the gun.' " After about 20 minutes, defendant told Warren and Allison to get in the bathtub and start counting. He also told them if they did not count long enough he would be outside waiting for them. Warren believed this was a threat to shoot them if they did not remain in the house long enough.

Warren and Allison stayed in the bathroom for a minute or two and then went to lock the front door. Before they reached the front door, Warren's neighbor Myron Dorsey and two other men entered the house, where they stayed for a minute or two before leaving. Warren then locked the front door and called her grandmother. She subsequently identified defendant and Spivey in photographic lineups.

That evening, Dorsey was hanging out on the front porch of his mother's house with his younger brother Brian Walker and two of Walker's friends. The house was across the street and four to five houses from Warren's home. Dorsey saw Warren and Allison walk to Warren's car that evening. Two men he did not recognize walked from a truck towards Warren and Allison. The men then went into Warren's house with Warren and Allison.

About 15 to 20 minutes later, Dorsey went to the side of his mother's house to throw away cans. He heard a sound like a firecracker and Walker say he was hit. Dorsey ran to Warren's house to ask about the men who entered it. Warren fainted when she tried to talk to him. Dorsey heard a truck drive off; he later noticed that the truck parked on the corner was gone.

Walker died of internal bleeding from a gunshot wound to the pelvis that damaged several arteries.

On June 23, 2011, Officers executed a search warrant at an apartment and found indicia that defendant lived there. A loaded shotgun was found under the cushions of the

3

living room couch, and a loaded .45-caliber assault weapon with a magazine and silencer was found in the bedroom closet. The bullet that killed Walker was a .45-caliber bullet exhibiting six lands and grooves with a right hand twist. The firearm found in defendant's closet was a .45-caliber weapon and also exhibited six lands and grooves with a right hand twist. The type of bullet used to kill Walker prevented finding an exact match with any specific firearm, including the one found in defendant's closet. Warren's identification card, social security card, credit card, and handgun safety certificate were also found in the home.

Forty-nine bindles of heroin were found in a box in the bedroom. Eleven bindles of cocaine base were found in the pocket of a pair of jeans. A Stockton police officer testifying as an expert in the investigation of narcotics offenses opined the heroin and cocaine were possessed for sale.

Defendant was interviewed by officers at the police station on June 23, 2011. He admitted seeing Allison and Warren walking down the street, but he and Spivey only talked to them. Defendant did not know Spivey took anything and claimed someone must have thrown identification cards and credit cards all over his apartment. Later in the interview, defendant said Spivey handed him a gun when they were in Warren's house. He and Spivey went in opposite directions when they left Warren's house. He saw Spivey arguing with the people across the street about gang matters and then heard a "big ass flash, pow."

DISCUSSION

I

Defendant was convicted of kidnapping for purposes of robbery against Warren in count 2 and robbery of Warren in count 4. The trial court imposed consecutive terms on both counts. Defendant contends the trial court should have stayed sentence for his robbery conviction pursuant to section 654. The Attorney General concedes the point. We agree.

4

Section 654, subdivision (a) provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ." "The failure of defendant to object on this basis in the trial court does not forfeit the issue on appeal. [Citation.]" (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338.)

" 'The proscription against double punishment in section 654 is applicable where there is a course of conduct which . . . comprises an indivisible transaction punishable under more than one statute. . . . The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one.' [Citation.] 'The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced. [Citation.]' [Citation.]" (*People v. Coleman* (1989) 48 Cal.3d 112, 162.)

Warren and Allison were kidnapped solely to facilitate the robbery. Defendant and his accomplice ransacked Warren's home immediately after transporting Warren and Allison inside the house. The kidnappers then threatened the victims to prevent them from moving, which aided in their escape and subsequent completion of their robbery. In short, the robbery and kidnapping were inseparable from each other as part of a single plan. The trial court should have stayed sentence on the single count of robbery (Warren) in count 4.

Section 654 requires the trial court to impose the sentence with the greatest possible term of imprisonment. (§ 654, subd. (a).) Kidnapping for robbery is punishable by life with the possibility of parole (§ 209, subd. (b)(1)), while first degree robbery is punishable by three, four, or six years (§ 213, subd. (a)(1)(B)). Therefore, we shall modify the judgment to stay sentence on the robbery conviction in count 4. Since the

5

robbery count was the principal determinate term, we remand for the trial court to resentence defendant on the remaining determinate terms.

## II

Defendant contends there is insufficient evidence he used a firearm in a menacing manner to support a true finding on the personal use of a firearm enhancement. We disagree.

Section 12022.53, subdivision (b) adds 10 years to a sentence when a defendant uses a firearm in the commission of a felony. At issue is the meaning of the phrase, "uses a firearm." " '[U]sed a firearm' " is defined by statute as, "to display a firearm in a menacing manner, to intentionally fire it, to intentionally strike or hit a human being with it . . . ." (§ 1203.06, subd. (b)(2); see *People v. Cory* (1984) 157 Cal.App.3d 1094, 1101-1104 [concluding the definition of " 'used a firearm' " in § 1203.06 applies equally to § 12022.5][4] .) The jury was instructed with CALCRIM No. 3146, which incorporates this language. The pertinent component of the definition here is "to display a firearm in a menacing manner," because defendant did not fire or hit anyone with a gun while in the house.

Defendant claims the "common understanding of the word 'menacing' is the act of threatening or appearing intent on causing harm." He claims there is no evidence he ever "threatened" a victim with the gun or pointed the weapon at either one of them, as the only testimony regarding his use of the handgun is to the effect he held it with his arm resting on the kitchen counter while Spivey ransacked the home. From this, defendant concludes his acts do not fit the common understanding of the term "menacing."

---

[4] The cases that have interpreted section 12022.5's requirement for "personal use" have also been used to analyze "personal use" under section 12022.53. (See *People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1059-1060.)

6

" 'A firearm use enhancement attaches to an offense, regardless of its nature, if the firearm use aids the defendant in completing one of its essential elements.' [Citation.] The enhancement is not limited 'to situations where the gun is pointed at the victim . . . .' [Citation.] Personal use of a firearm may be found where the defendant intentionally displayed a firearm in a menacing manner in order to facilitate the commission of the underlying crime. [Citations.] [¶] 'Thus when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure.' " (*People v. Carrasco, supra,* 137 Cal.App.4th at pp. 1059-1060.)

" 'We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction. [Citation.] Thus, we presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.' [Citation.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) Defendant's display of the weapon was clearly deliberate. Any doubt as to this conclusion is erased by his implied threat to Warren and Allison he would shoot them if they left the home too quickly after he and Spivey left. Holding out a gun in plain sight of the victims during a kidnapping and home invasion robbery displays the weapon in a menacing manner, and defendant's contention to the contrary is without merit.

III

Defendant claims, even if there is sufficient evidence he displayed the firearm in a menacing manner, there is insufficient evidence he personally used the firearm during the commission of the kidnapping for robbery counts. He notes Warren testified she did not see defendant with a handgun until she saw him holding it while resting his arm on the counter in the kitchen. Since asportation is a necessary element of kidnapping and there was no evidence defendant displayed the handgun in a menacing manner during the

7

asportation, defendant concludes there is insufficient evidence to support the firearm enhancement for the two kidnapping counts.

"Kidnapping is a substantial movement of a person accomplished by force or fear. [Citations.]" (*People v. Cortez* (1992) 6 Cal.App.4th 1202, 1209.) It is considered a continuing offense: once the forcible movement of a person commences, the kidnapping is ongoing and continues "until such time as the kidnapper releases or otherwise disposes of the victim and has reached a place of temporary safety . . . ." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1159.) In other words, "as long as the detention continues, the crime continues." (*Parnell v. Superior Court* (1981) 119 Cal.App.3d 392, 408, fn. omitted.)

Weapon possession during the commission of a crime must "have some 'facilitative nexus' to that offense." (*People v. Bland* (1995) 10 Cal.4th 991, 1002, italics omitted.) With respect to felony drug possession, a continuing offense, "a defendant is armed 'in the commission' of that crime so long as the defendant had the firearm available for use in furtherance of the drug offense at some point during the defendant's possession of the drugs." (*Ibid.*) Likewise, a defendant is armed during the commission of a kidnapping if he had a firearm available for use at some point between the initial detention and when he disposes of the victim and reaches a place of temporary safety.

Defendant displayed the weapon in a menacing manner by showing it to Warren and Allison while they were being held in the kitchen. Since the kidnapping for robbery was ongoing at that point, defendant personally used the firearm during the commission of the kidnapping offenses. Defendant's contention is consequentially without merit and we therefore reject it.

## IV

Defendant contends it was prejudicial error for the trial court not to give an instruction sua sponte on the nexus between the homicide and the felonies. We disagree.

The prosecution's theory was felony murder with defendant as either the shooter or as an aider and abettor. The felony-murder rule holds those who commit specified felonies strictly responsible for any killing committed by a cofelon during the commission or attempted commission of the felony, whether the killing is intentional, unintentional, or accidental. (*People v. Cavitt* (2004) 33 Cal.4th 187, 197 (*Cavitt*).)

In *Cavitt*, the Supreme Court recognized felony-murder liability was not predicated on the killing having to advance the underlying felony. (*Cavitt, supra*, 33 Cal.4th at p. 198.) "Instead, for a nonkiller to be responsible for a homicide committed by a cofelon under the felony-murder rule, there must be a logical nexus, beyond mere coincidence of time and place, between the felony the parties were committing or attempting to commit and the act resulting in death."[5] (*Id*. at p. 201.) The instructions given in *Cavitt*,[6] which informed the jury "that 'the killing occurred *during* the commission or attempted commission of robbery or burglary' by 'one of several persons *engaged in the commission*' of those crimes" sufficiently "apprised the jury of the need for a logical nexus between the felonies and the homicide." (*Id.* at p. 203, original italics.) Since the existence of a logical nexus between the killing and the felony was not an element of the crime, there was no duty sua sponte for the trial court to clarify it when the matter was not at issue. (*Id*. at p. 204.) The trial court had a duty to instruct

---

[5]    In addition to a logical nexus, there must also be a temporal relationship between the underlying felony and the homicide. (*Cavitt, supra*, 33 Cal.4th at p. 193.)

[6]    The *Cavitt* jury was instructed in conformance with CALJIC No. 8.27, which read in pertinent part:  " 'If a human being is killed by one of several persons engaged in the commission of the crime[s] of burglary or robbery, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder in the first degree, whether the killing is intentional, unintentional, or accidental.' " (*Cavitt, supra*, 33 Cal.4th at p. 203, fn. 4.)

only when the evidence raises an issue as to the existence of a logical nexus between the felony and the homicide. (*Ibid.*)

The jury in this case was given the standard jury instruction on felony murder under an aider and abettor theory, CALCRIM 540B,[7] and on the requirement the felony and homicide must be part of one continuous transaction, former CALCRIM No. 549.[8]

---

[7] The jury was instructed with CALCRIM No. 540B in pertinent part as follows: "The defendant is charged in Count 1 with murder, under a theory of felony murder. [¶] The defendant may be guilty of murder, under a theory of felony murder, even if another person did the act that resulted in the death. I will call the other person the perpetrator. [¶] To prove that the defendant is guilty of first degree murder under this theory, the People must prove that: [¶] 1. The defendant committed, or aided and abetted kidnapping and/or robbery; [¶] 2. The defendant intended to commit, or intended to aid and abet the perpetrator in committing kidnapping and/or robbery; [¶] 3. If the defendant did not personally commit kidnapping and/or robbery, then a perpetrator, whom the defendant was aiding and abetting, personally committed kidnapping and/or robbery; [¶] [AND] [¶] 4. While committing kidnapping and/or robbery, the perpetrator caused the death of another person. [¶] A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent." The jury was also instructed on felony liability for the killer CALCRIM No. 540A. That instruction is irrelevant to defendant's contention as the logical nexus requirement applies only to first degree murder liability for a defendant who is not the actual killer. (See *Cavitt, supra*, 33 Cal.4th at p. 201.)

[8] The jury was instructed with former CALCRIM No. 549 as follows: "[I]n order for the People to prove that the defendant is guilty of murder under a theory of felony murder, the People must prove that the kidnapping and/or robbery and the act causing the death were part of one continuous transaction. The continuous transaction may occur over a period of time and in more than one location. [¶] In deciding whether the act causing the death and the felony were part of one continuous transaction, you may consider the following factors: [¶] 1. Whether the felony and the fatal act occurred at the same place; [¶] 2. The time period, if any, between the felony and the fatal act; [¶] 3. Whether the fatal act was committed for the purpose of aiding the commission of the felony or escape after the felony; [¶] 4. Whether the fatal act occurred after the felony but while [on or more of] the perpetrator[s] continued to exercise control over the person who was the target of the felony; [¶] 5. Whether the fatal act occurred while the perpetrator[s] were fleeing from the scene of the felony or otherwise trying to prevent the discovery or reporting of the crime.; [¶] 6. Whether the felony was the direct cause of death; [¶] AND [¶] 7. Whether the death was a natural and probable consequence of the

10

Defendant did not request and the trial court did not give a clarifying instruction on the logical nexus between the homicide and the felonies.

Defendant argues "the evidence here raised a "logical nexus issue." According to defendant, "[i]t was unclear who fired the fatal shot, and it was a mystery as to why that shot was fired." From this, he concludes the court had a duty to give a clarifying instruction on the issue sua sponte.

Defendant's sparse argument misunderstands the logical nexus requirement. As in *Cavitt*, the standard jury instruction given here apprised the jury of the logical nexus requirement by informing the jury that the People must prove one of the perpetrators committed the homicide during the commission of the robbery and/or the kidnapping, and the homicide and felonies must be part of one continuous transaction. The fact defendant's accomplice may be the actual killer rather than defendant is insufficient to require further instruction on logical nexus, as the logical nexus requirement applies only if the accused is not the actual killer. (See *Cavitt, supra*, 33 Cal.4th at p. 201.) The apparent lack of motive likewise does not support a sua sponte duty to instruct. "[A] nonkiller's liability for felony murder does not depend on the killer's subjective motivation but on the existence of objective facts that connect the act resulting in death to the felony the nonkiller committed or attempted to commit." (*Id.* at p. 205.) Since felony-murder liability can be predicated on an accidental killing, the killer does not even need a motive to kill or harm the victim.

Our Supreme Court suggests situations requiring additional instruction on the logical nexus between the felony and the homicide will be at best rare. Felony-murder liability requires only that "the parties to have been jointly engaged in the perpetration or the attempt to perpetrate the felony at the time of the act resulting in death. A

_____

felony. [¶] It is not required that the People prove any of these factors or any particular combination of these factors. The factors are given to assist you in deciding whether the fatal act and the felony were part of one continuous transaction."

11

confederate who performs a homicidal act that is completely unrelated to the felony for which the parties have combined cannot be said to have been 'jointly engaged' in the perpetration or attempt to perpetrate the felony at the time of the killing. Otherwise, 'if one of two burglars ransacking a home glances out of a window, sees his enemy for whom he has long been searching and shoots him, the unarmed accomplice, party only to the burglary, will be guilty of murder in the first degree.' [Citation.]" (*Cavitt, supra*, 33 Cal.4th at p. 200.)

Dorsey heard the shot before hearing the truck drive off. Therefore, the murder victim, Walker, was shot before the defendants could complete the felony by entering the truck and driving off. (See *Cavitt, supra*, 33 Cal.4th at p. 208 ["The 'escape rule' defines the duration of the underlying felony, in the context of certain ancillary consequences of the felony [citation], by deeming the felony to continue until the felon has reached a place of temporary safety"].) Although Walker was not a victim of the underlying felonies, he was, like his brother Dorsey, a potential witness to the robbery and kidnapping by being able to observe defendants enter and leave Warren's home. Defendant admitted seeing Spivey talking to people across the street and seeing a flash that lit up the area and hearing a "pow." Since the evidence shows the killing was committed during the felony and there is no evidence showing the killing was completely unrelated to the robberies and kidnappings, the trial court was under no duty sua sponte to give a clarifying instruction on logical nexus.[9]

---

[9] Defendant's claim that counsel was ineffective in failing to request a clarifying instruction is also without merit. Since the trial court adequately instructed the jury on the temporal nexus requirement, and logical nexus was not at issue, counsel could reasonably conclude that further instruction was not necessary.

## DISPOSITION

Sentence for count 4, robbery, is stayed pursuant to section 654.  The case is remanded for the trial court to resentence defendant on the offenses with determinate terms.  In all other respects, the judgment is affirmed.  Upon resentencing, the trial court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.


      NICHOLSON     , Acting P. J.


We concur:


      DUARTE     , J.


      HOCH     , J.