Filed 12/1/20; Certified for Publication 12/17/20 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E074054 |
| v. | (Super.Ct.No. FVA04210) |
| ALEXANDER PALACIOS, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Michael A. Knish, Judge. Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Scott C. Taylor, and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

1

I

INTRODUCTION

In 2018, the Legislature passed and the Governor signed into law Senate Bill No. 1437 (Senate Bill 1437), legislation that prospectively amended the mens rea requirements for the offense of murder and restricted the circumstances under which a person can be liable for murder under the felony-murder rule or the natural and probable consequences doctrine. (Stats. 2018, ch. 1015, § 4.) Senate Bill 1437 also established a procedure permitting certain qualifying persons who were previously convicted of felony murder or murder under the natural and probable consequences doctrine to petition the courts that sentenced them to vacate their murder convictions and obtain resentencing on any remaining counts. (*Ibid*.; see Pen. Code,[1] § 1170.95)

Defendant and appellant Alexander Palacios appeals from an order denying his petition to vacate his first degree murder conviction and obtain resentencing under the procedures established by Senate Bill 1437. Defendant argues the trial court erred in summarily denying his petition because he established a prima facie case entitling him to a full hearing pursuant to section 1170.95. We reject this contention and affirm the postjudgment order denying defendant's section 1170.95 petition.

---

[1] All future statutory references are to the Penal Code unless otherwise stated.

II

FACTUAL AND PROCEDURAL BACKGROUND[2]

On May 1, 1995, the Peralta Family lived on Valencia Street in Fontana. The family included Kathy Velasquez and her three children, Arthur Peralta (age 16), Valerie Peralta (age 14), and George Peralta (age 10). Roger Coffman (age 16) also lived with them. Down the street, Albert Zamora lived in an apartment complex. Zamora had moved to Fontana from West Covina where he was friends with defendant, George Maldonado (age 18), Lewis Pham (age 16), Harry Nabeshima (age 18), and others. The group referred to themselves as OSK, or Old School Krew.[3]

Prior to May 1, 1995, Maldonado visited Zamora in Fontana. On May 1, Maldonado and Zamora tried to rob Roger Coffman. They threatened him with a knife, chasing after him as he ran to the Peralta house. At the house, Zamora and Maldonado attempted to force their way inside. Arthur Peralta pushed them out. Also present were Chester Howard, Haley Stockdale, Michael Moorer, Zamora's sister, Zamora's mother, and some of her friends. After Zamora and Maldonado kicked down the front door to the Peralta house, Arthur Peralta shot Maldonado in the neck. The wound was not fatal.

---

[2] The factual background is taken from this court's nonpublished opinion in defendant's prior appeal, case No. E017475. (*People v. Palacios* (Oct. 20, 1997, E017475) [nonpub. opn.] (*Palacios I*).) We took judicial notice of the nonpublished opinion in case No. E017475; a copy of the opinion is attached to defendant's January 27, 2020 request for judicial notice as attachment A. (Evid. Code, § 452, subd. (d).)

[3] In response to a pretrial motion, the trial court ordered the parties not to refer to "gangs," but did permit the parties to refer to the group or association to which defendant belonged.

3

Soon after defendant heard that Maldonado had been shot, he (defendant) called Pham to talk about the shooting. Defendant was angry. He drove a gray Toyota minivan to Nabeshima's house to convey the news of the shooting and his desire to get even with Arthur Peralta. Defendant tried to get Nabeshima to go with him (defendant), but Nabeshima refused to go. Nabeshima was afraid of defendant and Pham. Defendant told Nabeshima to call Pham and tell him to be ready and to have his gun ready. Defendant left, saying that he was going to Pham's house.

Nabeshima called Pham who indicated that he had spoken with defendant. Pham was very angry. He stated that he was going to take care of Arthur Peralta. He had a .380-caliber gun. Nabeshima said that he did not want anything to do with it. However, he conveyed defendant's message that he was coming to get Pham and that Pham should get his gun and be ready.

Anticipating trouble in return for the shooting of Maldonado, Velasquez asked her friend, Jenny Gomez, to come and pick up the children and take them to Moreno Valley for safekeeping. Gomez went with Velasquez and Valerie Peralta to take Arthur Peralta to the police station where he surrendered himself to the police. The Peraltas returned from the police station after 10 p.m. Gomez, her cousin Kathy Guerrero, Coffman, George Peralta, and Velasquez were all in the living room in the front part of the house. Valerie Peralta was in the den with her boyfriend, Robert Kalo White (age 14). They had turned off most of the lights because they anticipated trouble. The only lights on were the kitchen lights.

4

Defendant and Pham drove to the Peralta's house. As they approached, they turned off the headlights of the van. One of the men, wearing dark clothes, quickly walked up to the darkened house. He returned to the van, then both Pham and defendant quickly came back to the house. They squatted down at the knees while running. Gomez and Coffman saw the men approaching the house and ushered everyone into a front bedroom to hide. Gomez, her cousin, and Velasquez locked themselves in the bathroom and called the police from a cordless phone. They were not able to warn Valerie Peralta or White because they could not safely walk through the lighted kitchen to get to them.

The next door neighbor, Patricia Castanaza, heard someone at the Peralta's back door say in Spanish, "'here, here it is.'" She was aware of the shooting of Maldonado and was expecting trouble.

Valerie Peralta and White heard a knock on the kitchen door. As Valerie started to get up to answer it, White pushed her down and went instead. Someone outside asked if Arthur Peralta was there. White replied that he was not. A few seconds later two gunshots were fired through the window portion of the door. White was struck in the chest by one of the shots and died a short time later.

Upon hearing the shots, Castanaza went to the floor and crawled to her children's room to protect them. She saw a man, with many of the same characteristics as defendant, run across the yard in front of her house and jump into a gray van, which had its engine running with the lights off.

5

A few days later, Nabeshima, Maldonado, Pham, and other members of OSK met outside a video store in West Covina. Pham bragged about shooting Arthur Peralta. The group agreed that the members would each tell a false story implicating a fictitious person named "Mark," who would be described as a member of B & G, a West Covina Filipino gang, as the shooter. They decided to use the nickname "Dopey" for the fictional shooter—similar to Pham's nickname of Dope.

Nabeshima initially went along with the gang and lied to the police. He picked a picture of a boy name Mark Zamala out of a yearbook. However, after the police told Nabeshima that they knew he was lying and that he could be prosecuted for his lies, he decided to tell the truth. He admitted that the story involving "Mark" was false, and implicated defendant and Pham as the persons who had really gone to Fontana and who were actually involved in the shooting of White.

On May 24, 1995, Pham was taken into the police station for questioning. During the interrogation, Pham stated that he had gone to the Peralta house in a van and had a .380 handgun with him. Pham stated that he had knocked on the door and asked for Arthur; however the person at the door stated that Arthur was not there. Pham stated that he fired two shots through the glass door, and subsequently gave the gun to a friend who lived in Los Angeles County. The gun was recovered by the police and tested; however, the test results were inconclusive as to whether or not the gun recovered had actually fired the bullets that killed White.

At trial Gomez said that defendant fit the description of the person she saw at the Peralta house that night because he had the same color of skin, same height and body structure. The facial features and complexion looked like him. On the night of the murder, Castanaza told the police that she did not see anything because she was afraid of retaliation. Later, she told the police that she had seen a Hispanic or very light skinned Black man running from the scene. She was shown three photo lineups with Black men; however, she did not pick any of those as the perpetrator. Castanaza picked defendant out of a separate photo lineup. She identified him at the preliminary hearing. Although she did not definitively identify him at trial as the perpetrator, she did testify that he shared all of the characteristics of the person she saw running away from the murder.

Coffman told the police that he thought the assailants were Black. Valerie Peralta told the police that the voice at the door sounded like Chester Howard's voice.

Defendant presented no affirmative defense. Instead, he argued that this was a case of mistaken identification; that there was simply not enough evidence to place him at the scene of the murder.

On September 14, 1995, a jury convicted defendant of first degree murder (§ 187, subd. (a)) and found true the allegation that a principal was armed with a firearm during the commission of the murder (§12022, subd. (a)(2)). Defendant was sentenced to an indeterminate term of 25 years to life with the possibility of parole on the murder charge, with a consecutive one-year term on the firearm allegation.

On October 20, 1997, we affirmed the judgment. In doing so, we rejected defendant's argument that there was insufficient evidence to prove the killing of White was a natural and probable consequence of the attempted murder of Arthur Peralta. We also disagreed with defendant's contention that if Pham mistakenly believed he shot Arthur Peralta, then the transferred intent doctrine, not the natural and probable consequences doctrine, applies to assess liability. (*Palacios I*, *supra*, E017475 at pp. 7-9.) In addition, we rejected all of defendant's instructional error claims with the exception of one, finding the error to be harmless beyond a reasonable doubt. We also disagreed with defendant's argument that the natural and probable consequences doctrine violates the separation of powers doctrine. (*Id*. at pp. 9-22.)

In 2018, after defendant's judgment of conviction became final, the Legislature enacted and the Governor signed Senate Bill 1437, effective January 1, 2019. (See Stats. 2018, ch. 1015, § 1, subd. (f).) (2017-2018 Reg. Sess.) Senate Bill 1437 amended the felony-murder rule and the natural and probable consequences doctrine as it relates to murder. Senate Bill 1437 also added section 1170.95, which allows those "convicted of felony murder or murder under a natural and probable consequences theory . . . [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts . . . ." (§ 1170.95, subd. (a).)

On January 4, 2019, defendant in propria persona filed a petition for resentencing pursuant to section 1170.95, requesting that his murder conviction be vacated based on

changes to sections 188 and 189, as amended by Senate Bill 1437. The trial court thereafter appointed counsel to represent defendant, and the People filed opposition to the petition for resentencing. The People argued that defendant failed to make a prima facie showing he falls within the provisions of section 1170.95, and thus requested the court deny defendant's request for relief.

The trial court heard the petition on August 22 and September 9, 2019. The court denied the petition for resentencing, finding defendant had not set forth a prima facie case for relief. The court noted, "It's nonsensical to me to apply this law in a case where the Defendant was convicted of being a major aider and abettor in going to a house for revenge; and even though he wasn't the shooter, they sort of came in with guns blazing, and the other Defendant shot the victim." The court also explained the case was not prosecuted under a felony-murder theory but "an aiding and abetting of an attempted murder that led to a murder of someone else, and so this law doesn't apply to [defendant]."

On November 5, 2019, defendant filed a timely notice of appeal from the denial of his section 1170.95 petition.

III

DISCUSSION

Defendant contends the trial court erred in denying his section 1170.95 petition for resentencing because he had established a prima facie case for relief. He believes we should remand the matter for a full evidentiary hearing pursuant to section 1170.95, in

9

light of the changes in the law not anticipated by the parties 24 years ago and the trial court solely relying on this court's prior nonpublished opinion from his direct appeal.

Defendant further argues "[a] Court of Appeal's finding of sufficiency of the evidence is solely a judicial deference to a jury's verdict. That sufficient evidence was found by the Court of Appeal had no bearing on the present issue. In other words, from the Court of Appeal's unpublished opinion and on the present record, it cannot be said *definitively* that the jury found [him] guilty based on direct aiding and abetting murder such that the jury would not have found [him] guilty upon a natural and probable consequence theory of murder had the jury been properly instructed. The original Court of Appeal opinion noted erroneous jury instructions."[4]

A.    *Senate Bill 1437*

By amending sections 188 (defining malice) and 189 (defining the degrees of murder), Senate Bill 1437, effective January 1, 2019, changed "the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with

---

[4] Defendant mistakenly asserts we found more than one instructional error in his direct appeal. (See *Palacios I*, *supra*, E017475 at pp. 8-22.) We found one instructional error relating to the trial court's failure to instruct the jury that the target crime of attempted murder requires a finding of express malice. Nonetheless, we concluded the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24, in part, because the jury was instructed on both express and implied malice. (*Palacios I*, E017475 at pp. 11-13.)

reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); see *People v. Martinez* (2019) 31 Cal.App.5th 719, 722-723 (*Martinez*).)

Prior to Senate Bill 1437's enactment, a person who knowingly aided and abetted a crime, the natural and probable consequence of which was murder or attempted murder, could be convicted of not only the target crime but also of the resulting murder or attempted murder. (*People v. Chiu* (2014) 59 Cal.4th 155, 161 (*Chiu*); *In re R.G.* (2019) 35 Cal.App.5th 141, 144 (*R.G.*).) "This was true irrespective of whether the defendant harbored malice aforethought. Liability was imposed '"for the criminal harms [the defendant] . . . naturally, probably, and foreseeably put in motion." [Citations.]' [Citation.]" (*R.G.*, at p. 144.) "The purpose of the felony-murder rule [was] to deter those who commit[ted] the enumerated felonies from killing by holding them strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony." (*People v. Cavitt* (2004) 33 Cal.4th 187, 197.) Aider and abettor liability under the doctrine was thus "vicarious in nature." (*Chiu*, at p. 164.)

Senate Bill 1437 did not "alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator.'" (*People v. Lewis* (2020) 43 Cal.App.5th 1128, 1135 (*Lewis*), review granted Mar. 18, 2020, S260598.[5]) Accordingly, "[o]ne who

---

[5] Under California Rules of Court, rule 8.1115, we may rely on appellate cases while review is pending as persuasive authority. (Cal. Rules of Court, rule 8.1115(e)(1), eff. July 1, 2016.)

directly aids and abets another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law." (*Ibid.*)

Senate Bill 1437 also added section 1170.95. That section provides that "[a] person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts." (§ 1170.95, subd. (a).) A petition may be filed when the following three conditions are met: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder. [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)-(3); see *Martinez, supra*, 31 Cal.App.5th at p. 723.)

Courts of Appeal have interpreted section 1170.95 to provide for multiple reviews of a petition by the trial court. (*People v. Tarkington* (2020) 49 Cal.App.5th 892, 897-898, review granted Aug. 12, 2020, S263219; *People v. Cornelius* (2020) 44 Cal.App.5th 54, 57-58, review granted Mar. 18, 2020, S260410; *People v. Verdugo* (2020) 44 Cal.App.5th 320, 326-328 (*Verdugo*), review granted Mar. 18. 2020, S260493.) Subdivision (b) of section 1170.95 describes an initial review to determine the facial

12

sufficiency of the petition. (*Verdugo*, at pp. 327-328.) To be facially sufficient, the petition must contain the petitioner's declaration that the petitioner is eligible for relief according to the criteria in subdivision (a), the case number and year of conviction, and whether the petitioner is requesting appointment of counsel. (§ 1170.95, subd. (b)(1).) If the petition is missing any of this information "and cannot be readily ascertained by the court, the court may deny the petition without prejudice." (§ 1170.95, subd. (b)(2).) This initial review amounts essentially to a ministerial review to ensure that the right boxes are checked.

Section 1170.95, subdivision (c), then describes the next two levels of review and sets forth the trial court's obligations upon the submission of a complete petition. It provides, "The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section. If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner. The prosecutor shall file and serve a response within 60 days of service of the petition and the petitioner may file and serve a reply within 30 days after the prosecutor's response is served. These deadlines shall be extended for good cause. If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause."

The first sentence in subdivision (c) refers to a prebriefing, initial prima facie review to preliminarily determine a petitioner's statutory eligibility for relief as a matter of law. (*Verdugo*, *supra*, 44 Cal.App.5th at p. 329.) In this step of review, the trial court

determines, based upon its review of readily ascertainable information in the record of conviction and the court file, whether the petitioner is statutorily eligible for relief. (*Id.* at pp. 329-330.) The court may review the complaint, the information or indictment, the verdict form or the documentation for a negotiated plea, and the abstract of judgment. (*Ibid.*) A court of appeal opinion is part of the defendant's record of conviction (*id.* at p. 333; *Lewis*, *supra*, 43 Cal.App.5th at pp 1137-1138 [in determining the sufficiency of a section 1170.95 petition, the court may review the record of conviction, which includes the opinion in a defendant's direct appeal]; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1080-1081 [same]), as are jury instructions. (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1055, review granted Sept. 23, 2020, S263939.) If these documents reveal ineligibility for relief, the trial court can dismiss the petition. (*Verdugo*, at p. 330.)

Contrary to defendant's claim, Courts of Appeal, including this court, have rejected the argument that a trial court is limited to the allegations in the petition when determining whether the petitioner has stated a prima facie claim for relief under section 1170.95. The Courts of Appeal concluded that a trial court can consider the defendant's record of conviction, including documents in the court's own file and the appellate opinion resolving the defendant's direct appeal, in determining eligibility. (*Lewis*, *supra*, 43 Cal.App.5th at pp. 1137-1138; *Verdugo*, *supra*, 44 Cal.App.5th at pp. 329-330; *People v. Law* (2020) 48 Cal.App.5th 811, 820-821.) Relying on *Lewis* and *Verdugo*, we held that when determining whether a petitioner has stated a prima facie claim for relief under section 1170.95, the trial court is not limited to the allegations in

14

the petition. Rather, the court may consider the entire record of conviction and subsequent appellate opinion. (*Law*, at pp. 820-821 [trial court did not err by looking to the record of conviction, the opinion in the defendant's direct appeal, and the jury instructions from his trial in evaluating his petition].) We therefore conclude the trial court here did not err by considering the record of conviction in evaluating defendant's petition.

But, if the record of conviction does not establish as a matter of law the petitioner's ineligibility for resentencing, evaluation of the petition proceeds to the second prima facie review, in which "the court must direct the prosecutor to file a response to the petition, permit the petitioner (through appointed counsel if requested) to file a reply and then determine, with the benefit of the parties' briefing and analysis, whether the petitioner has made a prima facie showing he or she is entitled to relief." (*Verdugo*, *supra*, 44 Cal.App.5th at p. 330.) The trial court must accept as true the petitioner's factual allegations and make a preliminary assessment regarding whether the petitioner would be entitled to relief if the factual allegations were proved. (*Id*. at p. 328.)

Once the order to show cause issues, the court must hold a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts. (§ 1170.95, subd. (d)(1).) At such a hearing, both the prosecution and the defense may rely on the record of conviction or may offer new or additional evidence. (§ 1170.95, subd. (d)(3).) "[T]he burden of proof shall be on the

prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3); *Martinez*, *supra*, 31 Cal.App.5th at pp. 723-724.)

If the petitioner is found eligible for relief, the murder conviction must be vacated and the petitioner resentenced "on any remaining counts in the same manner as if the petitioner had not been [*sic*] previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1170.95, subd. (d)(1).) If the petitioner is found eligible for relief, but "murder was charged generically[ ] and the target offense was not charged," the petitioner's murder conviction must be "redesignated as the target offense or underlying felony for resentencing purposes." (§ 1170.95, subd. (e).)

B.    *Analysis*

Defendant contends he is entitled to a full evidentiary hearing because his jury in 1995 could have been presented with two theories, i.e., direct aiding and abetting and natural and probable consequences, and "the record does not conclusively demonstrate that with the benefit of proper jury instructions," he would have been guilty "under the direct theory and harbored express malice." He also argues that the jury might have based his murder liability on its conclusion that White's murder was the natural and probable consequence of the target felony of the attempted murder of Arthur Peralta. Therefore, he believes that if he aided and abetted in the attempted murder, he might have been convicted of murder without possessing malice because White was not the intended target but merely in the wrong place at the wrong time.

16

Here, there is no dispute defendant was not the actual killer. However, defendant's record of conviction shows that he directly aided and abetted in the murder. In our prior opinion, we explained, "Assuming that defendant intended to kill Arthur Peralta, but not White, the jury was instructed that, in order to find defendant guilty as an aider and abettor of murder, it was required to find that defendant and Pham shared that intent. The transferred intent instruction does not alter that requirement. Moreover, the evidence was plainly sufficient for the jury to infer that defendant engaged Pham's support and both went to the Peraltas' house gunning for Arthur Peralta. Whether defendant and Pham were both mistaken that White was Arthur Peralta, or whether only Pham made the mistake, both shared the same intent—to kill Arthur Peralta—and defendant was properly liable as an aider and abettor. [Citation.] [¶] As an aider and abettor, defendant is also liable for the natural and probable consequences of any act he knowingly aided and encouraged. [Citations.] The natural and probable consequences doctrine only applies when the defendant's confederate committed an offense *other than* the target crime. [Citation.] Here, defendant knowingly aided and encourage[d] Pham in the attempt to murder Arthur Peralta. However, Pham, believing that he shot Arthur Peralta, actually shot White. We find sufficient evidence to support a finding that the killing of White was a natural and probable consequence of the attempt to murder Arthur Peralta." (*Palacios I*, *supra*, E017475 at pp. 8-9, fns. omitted.)

In addition, the jury was instructed with the general rules of aiding and abetting liability pursuant to CALJIC No. 3.02, which, at the time of defendant's trial, provided:

17

"'One who aids and abets another in the commission of a crime is not only guilty of that crime but also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted. [¶] In order to find the defendant guilty of the crime of murder as charged in Count 1 you must be satisfied beyond a reasonable doubt that (1) the crime of murder was committed and (2) that the defendant aided and abetted such crime, (3) that a co-principal in such crime committed the crime of murder, and (4) the crime of murder of Robert Kalo White was a natural and probable consequence of the attempted commission of the crime of murder of Arthur Peralta.'" (*Palacios I*, *supra*, E017475 at p. 10, fn. 6.)

The trial court also instructed the jury regarding attempted murder being the target offense. At the time of defendant's trial, CALJIC No. 8.66 defined attempted murder. That instruction provided that the crime of attempted murder necessarily required the jury to find that the accused "harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being." (CALJIC No. 8.66) And this court in defendant's direct appeal concluded the record conclusively demonstrated that the jury found defendant had "harbored express malice." (*Palacios I*, *supra*, E017475 at p. 13.) We explained: "The evidence that the Pham harbored express malice was uncontradicted. Nabeshima testified that Pham was very angry and that he stated that he was going to take care of Arthur Peralta. Pham had a .380 caliber gun. Defendant drove to Pham's residence, picked up Pham, and the two of them drove to Arthur Peralta's home. At the Peraltas[' house], defendant and Pham went to the back door looking for

18

Arthur Peralta. They knocked on the door, asked for Arthur Peralta, was told he was not there, and then Pham immediately shot White. A few days later, Pham was bragging about having shot the guy who shot Maldonado. [¶] Although the jury was not told that they had to find that Pham harbored express malice, they were instructed on both express and implied malice. With respect to defendant's conviction of murder, the jury found that defendant committed murder in the first degree. Thus, it found that defendant harbored express malice. Having found defendant harbored express malice, the jury must have also found that Pham harbored express malice. Based on the record before us, there can be no question that the uncontradicted evidence established that Pham harbored express malice when he went with defendant to the Peralta house." (*Id*. at p. 13.)

As the *Lewis* court observed, while the amendment to section 188 effectively eliminated use of the natural and probable consequences doctrine to support a murder conviction, the change did not "alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator.' (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118; see *Chiu*, *supra*, 59 Cal.4th at p. 167 [a direct aider and abettor 'acts with the mens rea required for first degree murder'].)" (*Lewis*, *supra*, 43 Cal.App.5th at p. 1135.)

However, a direct aider and abettor can be convicted of murder notwithstanding Senate Bill 1437's amendments to sections 188 and 189, which changed nothing with regard to direct aider and abettor liability. "One who directly aids and abets another who commits murder is thus liable for murder under the new law just as he or she was liable

19

under the old law." (*Lewis*, *supra*, 43 Cal.App.5th at p. 1135.) Accordingly, defendant was required to make a prima facie showing that he was not convicted as a direct aider and abettor, and thereby "'falls within the provisions of' the statute." (*Id.* at p. 1137; § 1170.95, subd. (a)(3) & (c).) He failed to do so. The trial court therefore properly denied the petition on the basis of its finding that defendant had not established a prima facie case for relief by relying on this court's prior opinion in defendant's direct appeal.

Claiming the record does not "definitively" or "conclusively" show the jury found him guilty based on direct aiding and abetting murder, defendant argues at length he is entitled to a full evidentiary hearing under section 1170.95. Defendant has already challenged the sufficiency of the evidence in support of his conviction as an aider and abettor in his direct appeal, and lost. (See *Palacios I*, *supra*, E017475 at pp. 8-22.) As discussed above, nothing in the amendments to sections 188 and 189 altered the criminal liability of direct aiders and abettors of murder. Such persons may still be convicted of first degree premeditated murder based on their own knowledge of the perpetrator's unlawful purpose and their own intent to commit, encourage, or facilitate the commission of the murder. (*Chiu*, *supra*, 59 Cal.4th at p. 167 [direct aider and abettor "acts with the mens rea required for first degree murder"]; *Lewis*, *supra*, 43 Cal.App.5th at p. 1135.) Defendant cannot challenge the sufficiency of the evidence supporting his first degree murder conviction as a direct aider and abettor in an appeal from the denial of his section 1170.95 petition.

20

Likewise, we reject defendant's contention relating to "principles of law associated with unanimity" and constitutional right to a unanimous jury verdict. A similar claim was already raised and rejected in defendant's direct appeal. In his prior appeal, he argued "'[t]he rendition of the "natural and probable consequences" instruction . . . , coupled with the trial court's failure to give a "unanimity" instruction, deprived [him] of his Fourteenth Amendment right to due process of law and his Sixth Amendment right to jury trial.' In support of this argument, he contends that the jury was authorized to find him guilty either if he aided and abetted a premeditated murder of White or if he aided and abetted an attempted murder of Arthur Peralta." (*Palacios I*, *supra*, E017475 at pp. 21-22.) Defendant cannot challenge the right to a unanimous jury verdict in an appeal from the denial of his section 1170.95 petition.

In sum, the allegations in the petition that defendant cannot now be convicted of first or second degree murder because of changes made to sections 188 and 189 are contradicted by the record of conviction. Because the record of conviction plainly shows that defendant does not fall within the provisions of the statute, he did not make the first prima facie showing required under section 1170.95, subdivision (c). Defendant is thus ineligible for relief as a matter of law, and the trial court properly denied his petition. (§ 1170.95, subd. (c); *Verdugo*, *supra*, 44 Cal.App.5th at p. 329.)

## IV

## DISPOSITION

The trial court's postjudgment order denying defendant's section 1170.95 resentencing petition is affirmed.

CODRINGTON
Acting P. J.

We concur:

SLOUGH
J.

FIELDS
J.

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074054 |
| v. | (Super.Ct.No. FVA04210) |
| ALEXANDER PALACIOS, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Appellant. | |

THE COURT

A request having been made to this court pursuant to California Rules of Court, rule 8.1120(a), for publication of a nonpublished opinion heretofore filed in the above matter on December 1, 2020, and it appearing that the opinion meets the standard for publication as specified in California Rules of Court, rule 8.1105(c),

IT IS ORDERED that said opinion be certified for publication pursuant to California Rules of Court, rule 8.1105(c).

CERTIFIED FOR PUBLICATION

CODRINGTON
Acting P. J.

We concur:

SLOUGH
J.

FIELDS
J.

1