Filed 7/18/22 P. v. Lopez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060267 |
| v. | (Super. Ct. No. FWV903084-2) |
| NOLAN LOPEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a postjudgment order of the Superior Court of San Bernardino County, Cory G. Lee, Judge. Reversed and remanded with directions.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Alan L.

Amann, and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

*       *       *

In 2012, a jury convicted Nolan Lopez and a codefendant of first degree murder and several related crimes; the trial court sentenced Lopez to life in prison without the possibility of parole. In an unpublished opinion, this court modified the judgment in part but otherwise affirmed Lopez's convictions. (*People v. Rodriguez et al.* (Aug. 1, 2014, G049804) [nonpub. opn.].)

In 2018, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437), which amended Penal Code[1] sections 188 and 189 to limit accomplice liability under the felony-murder rule and the natural and probable consequences doctrine. SB 1437 also created a process for persons previously convicted of murder under the felony-murder rule or the natural and probable consequences doctrine to petition the trial court to vacate their murder convictions and for resentencing, if they could not be convicted of murder now based on the amendments to sections 188 and 189. (See former § 1170.95, renumbered § 1172.6 (Stats. 2022, ch. 58, § 10) eff. June 30, 2022 (hereinafter § 1170.95).)

Lopez filed a petition for resentencing under section 1170.95, alleging that he was convicted of murder under the felony-murder rule or the natural and probable consequences doctrine, and that under SB 1437 he could not now be so convicted. The trial court initially denied his petition on the basis that SB 1437 was unconstitutional. In an unpublished opinion, this court reversed that order and directed the trial court to consider the merits of Lopez's petition. (*People v. Lopez* (Oct. 9, 2020, G058453) [nonpub. opn.].)

---

[1] All further statutory references are to this code unless otherwise noted.

After considering the merits, the trial court again denied Lopez's resentencing petition, finding section 1170.95 does not apply. Lopez appeals that ruling; he asserts the record does not establish as a matter of law that he was the actual killer, and the court should have issued an order to show cause and held an evidentiary hearing to evaluate the disputed questions about his mental state and degree of participation in the underlying offenses.

We agree. The record of conviction here does not permit us to say Lopez was ineligible for relief as a matter of law. We therefore reverse the order dismissing Lopez's petition and remand the case to the trial court with directions to issue an order to show cause and to conduct a hearing to determine whether to vacate Lopez's murder conviction, recall his sentence, and resentence him.

**FACTS**

Lopez and his codefendant, Rodolfo M. Rodriguez, were convicted of first degree murder, second degree murder, robbery, carjacking, and related crimes. Our unpublished opinion from 2014 describes the circumstances of the murders as follows:

"A.    *The Murder*

"[Rafael] Ochoa owned his own trucking company and drove a Freightliner tractor-trailer. He regularly carried cash of around $300 to $500 for fuel. He did not own a handgun, and while he used a rifle when he went hunting, he kept neither guns nor ammunition in his truck. Ochoa kept his truck very neat, and he would never let anyone borrow it, even for a fee, nor did he pick up hitchhikers.

"On December 15, 2009, Ochoa drove from his home in Tulare County to deliver frozen juice to a business in Ontario. While en route, he spoke on his cell phone around 4:00 p.m. with his friend Maricela Martinez, who arranged to meet him at the Truck Stop of America (TA truck stop) in Ontario. He asked Martinez to bring him a gallon of milk, fruit, and cookies because he had used all his money for gas. He also

3

spoke on his cell phone to his adult son Alejandro, who found Ochoa happy and eager to arrive at his destination for the evening. Ochoa met Martinez at the truck stop, they had dinner nearby, and returned to the truck stop, where Ochoa told Martinez he was tired and would look for a parking place to sleep for the evening. Martinez departed, but called Ochoa a half hour later; he told Martinez he parked across the street from where she had dropped him off, and asked her to call him at 6:00 a.m. to wake him up. She agreed and said she would bring him breakfast.

"Around 11:30 p.m. that night, Connie Lambert and her husband Steven left the TA truck stop in their tractor-trailer, headed towards Interstate 10 west. Steven saw Ochoa's truck turn left from an intersection near the TA truck stop onto the Interstate 10 onramp. Steven and Connie headed in the same direction and after a short period of time, Ochoa's truck lurched to the left, onto the road berm. The driver corrected course, but then the truck careened off the right side of the road, down into a ditch where it hit a cement culvert, turned on its side, and came to rest against the wall adjoining a CarMax car lot.

"Ochoa climbed out of the driver's side of his truck. He hung on to the door with one arm, fell to the ground, and stumbled down the culvert. He then crawled out of the ditch and under the Lamberts' trailer, where they had parked by the side of the road. Connie noticed Ochoa was covered in blood and had a gunshot wound in his upper chest above his heart. Connie exited her truck cab to aid Ochoa and Steven dialed 911. As Connie assisted Ochoa, Ochoa told her he was robbed. Connie saw two dark-skinned men wearing hoodies and long shorts exit Ochoa's truck through the driver's side door. They jumped over the fence surrounding the CarMax car lot and ran away.

"Mario Miranda, a truck driver fluent in English and Spanish, saw the crash and stopped to help, where he found Ochoa surrounded by other truck drivers. Ochoa's body and clothing were covered in blood, he was in '[p]oor shape,' and clearly in agonizing pain. Ochoa did not respond when Miranda spoke to him in English, but

4

nodded that he spoke Spanish, and when Miranda asked what had happened, Ochoa answered, 'Mi robaton, mi tiraron valasos,' which means, 'I got robbed and I was shot.' Ochoa used the plural, meaning more than one person robbed and shot him.

"Police and medical personnel arrived quickly. Ontario Police Officer Justin Vanduyne saw Ochoa lying on the asphalt near the freeway, being loaded onto a gurney. Vanduyne followed the ambulance to the Arrowhead Regional Medical Center. About 10 minutes into the trip, Vanduyne observed that Ochoa required chest compressions. At 12:22 a.m. on December 16, the emergency room doctor pronounced Ochoa dead. After the coroner processed the body, Vanduyne could see that Ochoa suffered several gunshot wounds. Ochoa did not have his wallet or cell phone.

"B.    *The Police Investigation*

"Shortly after the crash, Kristina Pullen, a California Highway Patrol Officer responded to the scene and received a dispatch that two suspects were seen fleeing on foot through the CarMax parking lot. Finding nothing at the location, Pullen continued in her vehicle until she noticed a pedestrian matching the suspects' description. Pullen exited her vehicle with her weapon drawn, ordered Rodriguez to stop, and detained him without incident.

"Rodriguez explained his friends dropped him off there. Specks of blood dotted his face and there was a blood smear on his left hand. Pullen's partner asked Rodriguez if he was okay, but Rodriguez responded, 'I don't know what you're talking about.' Ontario police officers arrived and also noticed blood specks on Rodriguez's face, his shorts, and his socks. A forensic specialist came to take photos, but Rodriguez kept wiping his face on his shirt and bending over to wipe his face on his shorts. He continued to wipe his face despite numerous commands to stop, until an officer grabbed his shirt to hold him still. He tried to prevent the forensic officer from swabbing his hands for gunshot residue by continually moving around, wiping his hands on his shirt, and complaining his stomach hurt. Rodriguez did not appear to be under the influence of

5

alcohol or narcotics. He did not possess any drug paraphernalia, but the officers found him with Ochoa's cell phone.

"Meanwhile, Ontario Police Officer James Mikkelsen and his canine, Rex, searched along Inland Empire Boulevard, to the north of the CarMax lot. Around 3:00 a.m., Rex found Lopez was hiding in the bushes, where Lopez ignored Mikkelsen's order to show his hands and Lopez also refused to put his hands behind his back. Another officer handcuffed Lopez, patted him down for weapons, and removed items from his pockets, including brass knuckles, $363 in cash, and a gold ring with a horse emblem and a Freightliner keychain belonging to Ochoa. Lopez did not appear to be under the influence of narcotics.

"Ochoa's autopsy revealed he suffered three gunshots and all three bullets transected his body, including a gunshot wound on his rear, upper right shoulder. The bullet traveled from the back of his body to the front, right to left, and exited at the bottom of his neck. The medical examiner found another bullet entry wound, with soot, on the upper left side of his back. The soot meant the shot was fired from close range, within a foot and probably within a few inches; the bullet traveled back to front, left to right, and slightly upwards. Another bullet pierced Ochoa's left leg and exited the sole of his foot.

"Ochoa suffered bruises on his face, caused by a blunt object. There were bruises and abrasions on his arms, and bruises on his shoulders, torso, legs, and shins. Ochoa also had a patterned injury around the bottom of his rib cage which contained three parallel marks, caused by impact with a blunt object and consistent with Lopez's brass knuckles. The medical examiner concluded Ochoa's injuries were more consistent with a physical assault than in a vehicle crash.

"The medical examiner identified the upper body gunshot wounds as the cause of death. Both upper body bullet strikes caused internal injuries and bleeding, one piercing Ochoa's right lung and the other his spleen, liver, and pancreas. A person with

6

such injuries could remain conscious up to a few minutes, and might be able to talk. However, he would feel the effects immediately and would understand he was grievously wounded.

"The police investigation showed several calls from Ochoa's cell phone after the crash, beginning at 11:43 p.m. and repeating every 10 or 15 minutes. Most of the calls went to a phone in the location where Lopez was hiding, and others went to a number with a Los Angeles area code. Detectives also recovered surveillance footage from the CarMax location, which depicted Rodriguez removing items from his waistband and throwing them over a wall. Officers found by the wall a Ruger nine-millimeter semi-automatic handgun, a gun magazine, and three live rounds of nine-millimeter ammunition. Small amounts of blood smeared the left side of the gun's slide. The officers also found Ochoa's wallet on the ground where Rodriguez had attempted to throw it over the wall.

"Detectives recovered several bullets in or near Ochoa's truck cab, and forensic analysis showed they had been fired by Rodriguez's Ruger. Detectives found in the truck cab a bullet hole in the console; the position of the hole indicated the shot had come from behind the driver towards the console, and another bullet strike and bullet fragments by the gas pedal marked a shot traveling from the rear of the cab to the front. Another shot pierced the top part of the cab to the left of the driver's seat at a 30 to 45 degree angle. The cab was in disarray and blood stained the driver's seat.

"When a forensic specialist collected blood speck samples and DNA swabs from Rodriguez's cheek, he had no visible injuries. The size of the blood specks suggested high impact blood spatter. Lopez had a couple of scratches on the right side of his face when he was arrested and blood on his clothing, but no injuries to account for the blood. Lopez, Rodriguez, and Ochoa each had gunshot residue particles on their hands. A criminalist explained at trial that about 50 percent of gunshot victims are found with traces of gunshot residue, which may be deposited when a person fires a gun and the

7

victim is within 12 feet of a gun when it discharges or the victim touches a surface containing gunshot residue.

"DNA analysis showed Rodriguez was a possible major contributor to a swab from the right grip of the nine-millimeter handgun. There were two undetermined minor contributors. As to the left grip of the handgun, Ochoa and Lopez were possible major contributors and Rodriguez a possible minor contributor. Lopez was a possible major contributor to a swab on the right side of the gun's slide, while Ochoa was a possible minor contributor. As for the left side of the slide, Ochoa matched the major profile while Rodriguez was a possible minor contributor. The trigger contained a DNA mixture from three separate individuals, but forensic analysis did not disclose who they were. A DNA sample from the brass knuckles came from a single source matching Lopez, but a person struck while wearing clothing would not transfer DNA material to the brass knuckles.

"C.    *Nancy Lopez's Police Interview*

"Nancy Lopez was convicted of being an accessory after the fact based on the events that occurred on December 15, 2009, and she served 16 months in prison for the offense. [Fn. omitted.] When Nancy denied at trial any recollection of the events, the prosecution introduced a video recording and transcript of her interview with Ontario Police Department Detectives Kevin Dempster and Roger Planas in February 2010.

"She told the detectives she was dating Rodriguez's brother Eddie. On the night of the crash, she, defendants, and another friend, Eva Aguilar (known as 'Denise') headed in her car from Los Angeles County to Fontana to pick up a friend of hers named Zina. Nancy drove and along the way they stopped at a gas station near the TA truck stop. Nancy claimed she simply left Rodriguez and Lopez at the gas station when they went to use the restroom because she was in a hurry to pick up Zina. When she returned to pick them up, the entrance to the freeway was blocked and there were police cars everywhere.

8

"Nancy blurted out in her interview, 'It wasn't even supposed to be like that. They were supposed to wait for me. I was gonna come right back.' She denied knowing Rodriguez or Lopez had a gun. She added, 'Nolan [Lopez] and Mike [Rodriguez] knew that I'm not down with that bullshit[,] that carjacking shit [and] all that.' Nancy explained that she did not commit such crimes because she has children. She never thought Rodriguez and Lopez would put her in such a situation. She let them out of her car, told them to use the restroom, went to pick up Zina, and came back. She did not know what happened while she was gone.

"A detective showed Nancy a photo of Ochoa and told her he was killed hauling grape juice. The detective continued, 'You knew those guys were up to that.' Nancy responded, 'No, I didn't. But, I had a clue. That's why I left them there.' Nancy said she told Lopez, '[D]on't do that to me.' She also told Lopez that if they were going to 'do something else,' she was leaving. After she left, Rodriguez's brother Eddie telephoned her. He told her to return to the truck stop to look for Rodriguez and Lopez. When she did, the area was blocked off. She drove around for awhile, but gave up on finding them, and returned to Lopez's home.

"When a detective asked Nancy, 'What was [their] intentions [*sic*],' Nancy noted that they did not say explicitly and the plan was to pick up Zina. She observed, however, 'By that time I knew that they wanted to do something else because they were looking everywhere. I was like, Nolan, don't do this to me, don't do this to me.' Lopez asked her, 'What am I doing?' Nancy told Lopez she was not stupid. At the same time, Rodriguez kept pointing at trailers and remarking, 'Did you see that?' Nancy left because she did not want any part of it.

"The detective asked, 'What did you guys talk about . . . that caused you to leave 'em.' Nancy responded, 'That they were going to go jack the trailer.' Rodriguez pulled a gun out of his waistband in the backseat. Aguilar said, 'Whoa,' and told him to put it away, which he did.

9

"Nancy also told the detectives that Lopez directed Rodriguez to put the gun away. Rodriguez asked Lopez, '[D]o I take it with me?' Lopez said, 'Yeah, put it away.' At that point, Nancy left the two of them at the truck stop and went to pick up Zina. She did not intend to go back, but changed her mind when she received a call from Eddie.

"Nancy further explained that after she learned of the gun, she ordered defendants out of the car. When Lopez asked her to wait, she refused and left. When asked her what kind of trucks defendants were talking about while they were in the car, Nancy explained they merely said they were 'gonna come up big.' They walked away when she dropped them off at the truck stop. After she left, Eddie called her to tell her something happened, gave her Ochoa's cell phone number with a 559 area code, and directed her to pick up Rodriguez and Lopez. Nancy tried the number several times but there was no answer. She returned to the area, saw a truck flipped over, and suspected defendants were involved. She called Eddie back, who told her to keep looking for defendants. She, Aguilar, and Zina looked for defendants until around 1:00 a.m., when she refused Eddie's order to continue looking.

"Nancy also explained she became worried when she exited the freeway for gas, but found only a truck stop because she 'knew what kind [of] intentions they had.' Once she realized what was going on, she wanted to leave them there and play no part in whatever they were going to do. When she bought a hot dog at the truck stop, Lopez said, 'You're gonna be eating better than this.' She cried as she pumped gas, begging Lopez to tell her what he was going to do. Lopez said she should not worry, he would be good. Rodriguez and Lopez departed, with Lopez saying to her, 'Go your way and I'll go my way.' Lopez added that they would meet back up at his house. He told her that if anyone asked, she should say she dropped him off at the restroom and left. Nancy told Lopez to get back in the car so they could pick up Zina, but Lopez responded, 'No, I need to do this.'

10

"D.    Defense Case

"Rodriguez testified that on December 15, 2009, he, Nancy, and Aguilar celebrated Lopez's birthday at Lopez's house, using methamphetamine and drinking alcohol.  They drove to Fontana to pick up Zina, a stripper.  Rodriguez sat in the back seat of Nancy's car with Aguilar, and when he and Aguilar argued, he 'jumped out of the car,' and Lopez followed him.

"They tried to hitchhike after the two women drove away, and when Ochoa stopped his truck and rolled down his window, Lopez told Ochoa they were stranded. Lopez asked Ochoa for a ride to his (Lopez's) brother's house in La Puente and offered to pay for the ride. Ochoa agreed and accepted the money Lopez handed him.

"Lopez and Ochoa discussed trucks, and then Ochoa let Lopez drive while Rodriguez sat in the front passenger seat and Ochoa rode in the back of the cab.  As Lopez entered the freeway, Ochoa exclaimed, 'Hey, where are you guys going?  Fontana is the other way.'  But Rodriguez laughed and explained, 'We're not going to Fontana.' Ochoa nevertheless ordered Lopez to pull over.  When Lopez protested, 'Are you serious?  I just paid you,' Ochoa pulled out a gun, pointed it at the back of Lopez's head, and said, '[S]top the truck.'  Rodriguez unbuckled his seat belt and tried to get the gun away from Ochoa, hitting Ochoa in the face and biting his wrist.  Rodriguez and Ochoa grappled in the bunk area of the truck, where Rodriguez struggled for the gun, which discharged at least once before Rodriguez secured it.  When Ochoa reached for a stick, Rodriguez thought it was another gun so he started firing.  The truck crashed and Rodriguez fell to the floor, where he saw Ochoa's cell phone, which he took because he was stranded and needed to call someone for a ride.  He exited the truck through the driver's side window, climbed up the culvert, went to the CarMax, jumped over a wall, and ran through the parking lot, throwing the gun and the magazine over the wall.  He ran because he was scared, he did not want to go to jail, and he had previous bad experiences with law enforcement.

11

"Lopez also testified. He explained that on December 15, he, Rodriguez, Aguilar, and Nancy had been drinking and using methamphetamine when they went in Nancy's car to pick up Zina. Lopez took a pair of brass knuckles with him because when he first met Zina, she was with a 'big guy' who was either her boyfriend or her pimp. As they drove on Interstate 10, Lopez sat in front with Nancy, drinking beer, listening to music, and talking to Zina on the phone.

"Lopez handed the phone to Rodriguez, which caused an argument between Rodriguez and Aguilar. Nancy needed gas, so they pulled off, pumped the gas, and returned to the car, but Rodriguez and Aguilar were still arguing. Nancy told Rodriguez, 'Get the fuck out of my car,' so Rodriguez exited the vehicle. Lopez also exited to attempt to calm Rodriguez down. Nancy drove up, declared she did not want Rodriguez back in the car, ignored Lopez's entreaties to change her mind, and drove away.

"When Lopez and Rodriguez started hitchhiking, they spotted Ochoa parked outside the truck stop, sitting in his truck doing paperwork. Ochoa initially rejected their request for a ride because he was done driving for the night, but when they explained their predicament and offered to pay him $60, Ochoa agreed. Lopez explained he previously had driven trucks and Ochoa agreed to let him drive to La Puente when Lopez showed Ochoa his driver's license.

"Ochoa ordered Lopez to drive on an access road to test his driving skills before entering the freeway. Lopez complied, but when he turned onto the freeway, Ochoa screamed, 'Where are you going?' Lopez followed Ochoa's directive to pull over and park the truck, but Ochoa still struck him on the head with an object. Lopez saw that Ochoa held a gun, and Rodriguez grabbed for the weapon, but a shot discharged and Lopez veered sharply to the right, sending the truck into the culvert.

"After the crash, Lopez grabbed Ochoa's wallet, thinking it was his, and exited the truck through the driver's side window. He also mistakenly picked up Ochoa's

gold ring with the horse emblem at this time. Hearing police sirens, he panicked, ran, and hid in some bushes, where he fell asleep until the police dog bit his leg.

"*E.    Prosecution rebuttal case*

"The medical examiner testified Ochoa had no bite wounds anywhere on his body. He also diagrammed from the entry and exit wounds on Ochoa's body the trajectory of the fatal shots, and explained the sequence of events described by defendants was not possible.

"Detective Gary Naranjo of the Ontario Police Department testified that when he monitored an interview with defendants at the police station, he obtained a press release about the case. He modified the press release by placing some signature lines on it, writing the word 'shooter' below Rodriguez's name, and writing the word 'accomplice' below Lopez's name. He also added, 'do not release info.' and 'do not give video to press.' Finally, he added 'approved by' and his signature.

"Naranjo gave the press release to Sergeant David McBride, a press information officer, who entered the interview room and told defendants he was with the media department. He explained he would leave the press release for them to read over, ensure it was correct, and sign it. When McBride left the room, the police recorded the following conversation: 'Rodriguez: 52? When did you become 52? Oh—shit. We offed the old guy. You know we're all washed up right? [¶] Lopez: We're what? [¶] Rodriguez: We're all washed up. [¶] Lopez: [Inaudible] nothing. [¶] Rodriguez: I didn't tell them shit. [¶] Lopez: I didn't tell them shit either. They came up with their own. I told them I wanted a lawyer.'" (*People v. Rodriguez et al., supra,* G049804.)

An amended information charged Lopez and Rodriguez with willful, deliberate, and premeditated murder (§ 187, subd. (a); count 1), carjacking (§ 215, subd. (a); count 2), second degree robbery (§ 211; count 3), and related crimes. A jury acquitted them of the premeditated first degree murder charge (count 1). However, it found both defendants guilty of first degree felony murder (which the verdict forms

13

described as a lesser included offense of count 1[2]), second degree murder[3] (also a lesser included offense of count 1), carjacking, and robbery, and it found Rodriguez guilty of being a felon in possession of a firearm (§ 12021, subd. (a)(1)). The jury also found true two felony-murder special-circumstance allegations on the murder count based on the carjacking and robbery (§ 190.2, subd. (a)(17)(A) & (L)), and it found true numerous firearm allegations concerning Rodriguez, including that he personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm (*id.*, subd. (c)) causing great bodily injury or death (*id.*, subd. (d)), and as to both defendants that a principal personally used a firearm (*id.*, subd. (e)(1)).

The trial court sentenced Rodriguez to life in prison without the possibility of parole plus 44 years; it sentenced Lopez to life in prison without the possibility of parole plus 10 years. As noted, Lopez appealed, and this court affirmed his convictions in an unpublished opinion.

In April 2019, after the passage of SB 1437, Lopez filed a petition to vacate his sentence and for resentencing under section 1170.95. In support of his petition, Lopez submitted a signed declaration averring that he was convicted of second degree murder under the felony-murder rule or the natural and probable consequences doctrine, that he could not now be so convicted because of changes made to sections 188 and 189, that he wanted the trial court to appoint counsel for him during the resentencing process,

---

[2]     In fact, felony murder is not a lesser included offense of murder committed with malice aforethought. Because felony murder requires the commission of a designated felony and does not require malice, it has different elements and is not a lesser included offense of murder with malice. (See *People v. Lopez* (1998) 19 Cal.4th 282, 288.)

[3]     The parties agree it is unclear whether the second degree murder conviction was based on a direct perpetrator theory, on an aiding and abetting theory, on a natural and probable consequences theory, or on a felony-murder theory. We agree. In fact, we wonder about the propriety, given the facts here, of the three separate murder verdicts.

that he was not the actual killer, that he did not aid or abet the actual killer in the commission of murder with intent to kill, and that there was a prior determination by a court or jury that he was not a major participant in the felony and did not act with reckless indifference to human life.

The prosecution filed an informal response asserting Lopez's petition failed to demonstrate a prima facie case for relief along with a motion to strike the petition on the grounds that SB 1437 was unconstitutional. Lopez opposed that motion.

The trial court granted the prosecution's motion to strike the petition, finding SB 1437 was unconstitutional. This court reversed that order in an unpublished opinion and directed the trial court to consider the merits of Lopez's petition. (*People v. Lopez, supra,* G058453.)

The trial court then appointed counsel to represent Lopez and ordered further briefing. It later conducted a hearing and considered oral argument on the merits of Lopez's petition. The court again summarily denied the petition in April 2021, finding section 1170.95 does not apply. The court determined, based on its review of the record of conviction and in particular the verdict forms and jury instructions, that "it's pretty clear that the jurors determined that both defendants are actual killers." Lopez appealed.

## DISCUSSION

1.    *SB 1437*

Under prior law, a person who committed a murder in the perpetration of, or attempt to perpetrate, certain enumerated inherently dangerous felonies was guilty of first degree murder, even if the killing was unintentional or accidental. (*People v. Cavitt* (2004) 33 Cal.4th 187, 197; *People v. Ervin* (2021) 72 Cal.App.5th 90, 94 (*Ervin*).) Additionally, a person who knowingly aided and abetted a nonhomicide crime was guilty of any murder that was the natural and probable consequence of the intended crime, irrespective of the aider and abettor's mens rea. (*People v. Gentile* (2020) 10 Cal.5th

15

830, 845 (*Gentile*); *People v. Chiu* (2014) 59 Cal.4th 155, 164-167; *People v. Medina* (2009) 46 Cal.4th 913, 920.)

Effective January 1, 2019, the Legislature passed SB 1437, which limited the scope of the felony-murder rule and eliminated natural and probable consequences liability for murder as it applies to aiding and abetting. (See *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).) The bill's stated purpose was "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

SB 1437 added three separate provisions to the Penal Code. First, to amend the felony-murder rule, SB 1437 added section 189, subdivision (e): "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

Second, to amend the natural and probable consequences doctrine, SB 1437 added section 188, subdivision (a)(3): "Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." In effect, this provision "bars a conviction for first or second degree murder under a natural and probable consequences theory." (*Gentile, supra,* 10 Cal.5th at p. 846.)

Third, SB 1437 added section 1170.95 to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences

16

doctrine to seek relief. Under this provision, an individual may petition the trial court to vacate his or her conviction and to be resentenced on any remaining counts if he or she could not have been convicted of murder because of SB 1437's changes to the definition of the crime.

In a section 1170.95 petition for relief, the offender must aver that: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine[;] [¶] (2) [t]he petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder[; and] [¶] (3) [t]he petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)-(3); see also § *id.*, subd. (b)(1)(A).) Additionally, the petition shall state "[w]hether the petitioner requests the appointment of counsel." (*Id.*, subd. (b)(1)(C).) If a petition fails to comply with subdivision (b)(1), "the court may deny the petition without prejudice to the filing of another petition . . . ." (*Id.*, subd. (b)(2).)

If the petition satisfies those technical requirements, then the trial court must appoint counsel if requested. (§ 1170.95, subd. (b)(3); *Lewis, supra,* 11 Cal.5th at p. 957.) Next, "the prosecutor shall file and serve a response," and "[t]he petitioner may file and serve a reply within 30 days after the prosecutor's response is served." (§ 1170.95, subd. (c).)

Once briefing is completed, the trial court determines whether the petitioner has made a prima facie case for relief. (§ 1170.95, subd. (c).) If the court finds the petitioner has made a prima facie case under section 1170.95, the court shall issue an order to show cause. (*Ibid*.)

In determining whether the petitioner has stated a prima facie case for relief, the trial court's inquiry is limited; it must accept the petition's factual allegations as true and make a preliminary assessment whether the petitioner would be entitled to relief if those allegations were proven. (*People v. Lopez* (2022) 78 Cal.App.5th 1, 13 (*Lopez*).) The court may not reject the petitioner's factual allegations on credibility grounds, engage in factfinding, weigh the evidence, or exercise any discretion, unless the record contains facts refuting the petition's allegations, in which case the court may make a credibility determination adverse to the petitioner. (*Lewis, supra,* 11 Cal.5th at p. 971.) Simply put, the prima facie bar is "'very low.'" (*Id.* at p. 972.)

A prima facie showing is not made if the record of conviction demonstrates as a matter of law that the petitioner is ineligible for relief—i.e., "if the record of conviction conclusively establishes, with no factfinding, weighing of evidence, or credibility determinations, that (1) the petitioner was the actual killer, or (2) the petitioner was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree, (3) the petitioner was a major participant in the underlying felony and acted with reckless indifference to human life, or (4) the petitioner acted with malice aforethought that was not imputed based solely on participation in a crime." (*Lopez, supra*, 78 Cal.App.5th at p. 14.)

If the petitioner makes a prima facie case for relief under section 1170.95, the trial court must issue an order to show cause and hold a hearing "to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as

18

if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1170.95, subd. (d)(1).) If the parties do not stipulate to vacating the conviction and resentencing the petitioner (*id.*, subd. (d)(2)), the prosecution may present new and additional evidence at the hearing to demonstrate the petitioner is not entitled to resentencing (*id.*, subd. (d)(3)). The petitioner also has the opportunity to present new or additional evidence in support of the resentencing request. (*Ibid.*) "The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (*Ibid.*) At the hearing stage, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (*Ibid.*)

An order denying a resentencing petition on the ground that the defendant failed to make a prima facie case for relief is an appealable postjudgment order. A determination that a petitioner is ineligible for relief as a matter of law is a legal conclusion, which we review de novo. (*Lopez, supra*, 78 Cal.App.5th at p. 14.)

2.       *Analysis*

Lopez's petition complied with the technical requirements of section 1170.95, subdivisions (a) and (b). Accepting his petition's factual allegations as true, as we must, we conclude Lopez met the low prima facie threshold for relief under section 1170.95.

Nevertheless, the trial court found section "1170.95 does not apply in this case" because the record of conviction, particularly the verdict forms and jury instructions, show "the jurors determined that both defendants are actual killers." We cannot agree.

Turning first to section 188, the statute as amended requires malice aforethought in order to be convicted of any murder (except felony murder), thereby barring a conviction for first or second degree murder under a natural and probable

19

consequences theory. (§ 188, subd. (a)(3); see *Gentile, supra,* 10 Cal.5th at p. 846.) In this case, the jury found Lopez did not act with malice aforethought. The jury acquitted Lopez of "willful, deliberate, and premeditated murder" as charged in count 1. Further, in the verdict form finding Lopez guilty of felony murder, the jury found Lopez "guilty of felony murder, unlawfully and *without malice* killing a human being." (Capitalization removed; italics added.) Accordingly, to the extent any portion of Lopez's murder conviction was based on the natural and probable consequences doctrine, it would no longer be valid under current law. The parties agree it is unclear whether Lopez's murder conviction was based on a natural and probable consequences theory, but if it was, that conviction would no longer stand.

Turning next to section 189, the statute as amended limits felony-murder liability to cases in which (1) the petitioner was the actual killer, (2) the petitioner was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree, or (3) the petitioner was a major participant in the underlying felony and acted with reckless indifference to human life. (§ 189, subd. (e); *Lopez, supra,* 78 Cal.App.5th at p. 14.) The record of conviction here does not conclusively establish, without any factfinding, weighing of evidence, or credibility determinations, any of those requirements.

The People argue the jury's true findings on the felony-murder special-circumstance allegations, when considered along with the jury instructions, conclusively demonstrate the jury found Lopez was the actual killer. They argue the jury was instructed with CALCRIM No. 730, which is the form instruction that defines the special circumstance of murder committed during the commission of a felony. That instruction stated in pertinent part: "Rodolfo Rodriguez and Nolan Lopez are charged with the special circumstance of murder committed while engaged in the commission of Carjacking, Penal Code section 215, in violation of Penal Code section 190.2(a)(17)(L)

20

[or Robbery, in violation of Penal Code section 190.2 (a)(17)]. [¶] To prove th[ese] special circumstance[s] [are] true, the People must prove that: [¶] 1. The defendants committed, aided and abetted, or [were] a member of a conspiracy to commit Carjacking [or Robbery]; [¶] 2. The defendants intended to commit, or intended to aid and abet the perpetrator in committing, or intended that one or more members of the conspiracy commit Carjacking [or Robbery]; [¶] 3. *The defendant did an act that caused the death of another person*; [¶] AND [¶] 4. The act causing the death and the Carjacking [or Robbery] were part of one continuous transaction. . . ." (Italics added.)

Relying on element 3 of that instruction, the People contend the jury must have been convinced Lopez was the actual killer when they found the felony-murder special-circumstance allegation to be true. This court has repeatedly rejected that argument. (See *Lopez, supra,* 78 Cal.App.5th at pp. 4, 15-20 ["'actual killer'" under § 189 "refers to someone who personally killed the victim and is not necessarily the same as a person who 'caused' the victim's death"]; *Ervin*, *supra*, 72 Cal.App.5th at p. 105 ["A felony-murder special-circumstance finding does not categorically bar a petitioner from making a prima facie showing of entitlement to relief under section 1170.95 as a matter of law"]; see also *People v. Garcia* (2020) 46 Cal.App.5th 123, 151-153 ["actual killer" under § 190.2 is someone who "personally killed" the victim, not just someone who proximately caused the death].)

As read to the jury, CALCRIM No. 730 left open the possibility that the jury convicted Lopez of felony murder and found true the felony-murder special-circumstance allegations *without* finding he was the actual killer. "The jury was not instructed it had to find defendant personally killed the victim to convict him; the jury was instructed it only had to find defendant committed an act that caused the victim's death. The jury might have found defendant, though not the actual killer, participated somehow in the [carjacking and] robbery, and the victim's death was the direct, natural,

21

and probable consequence of an act committed in the course of his participation." (*Lopez, supra*, 78 Cal.App.5th at p. 20.)

Looking beyond CALCRIM No. 730 to the entire record of conviction here, we cannot conclude as a matter of law the jury found Lopez personally killed Ochoa or otherwise had the mental state required to convict under section 189, subdivision (e), as amended. In order to reach that conclusion, we would have to weigh the evidence, which would be impermissible at this stage. (*Lewis, supra*, 11 Cal.5th at p. 972.)

Because there are disputed questions about Lopez's mental state and degree of participation in the murder, the trial court should have issued an order to show cause and scheduled the matter for an evidentiary hearing.

## DISPOSITION

The trial court's order denying the resentencing petition is reversed. The case is remanded to the trial court with directions to issue an order to show cause under section 1172.6 and to hold a hearing to determine whether to vacate Lopez's murder conviction, recall his sentence, and resentence him.

GOETHALS, J.

WE CONCUR:

O'LEARY, P. J.

MARKS, J.*

* Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.